**STEAD MOTORS OF WALNUT CREEK, Plaintiff-Appellee,**

v.

**AUTOMOTIVE MACHINISTS LODGE NO. 1173, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, Defendant-Appellant.**

No. 87-2053.

United States Court of Appeals,
Ninth Circuit.

Argued En Banc and Submitted
Jan. 18, 1989.

Decided Oct. 6, 1989.

David Rosenfeld, Van Bourg, Weinberg, Roger and Rosenfeld, San Francisco, Cal., for defendant-appellant.

J. Mark Montobbio, Severson, Werson, Berke and Melchior, San Francisco, Cal., for plaintiff-appellee.

Joseph Colton, Beeson, Tayer and Silbert, Bodine & Livingston, San Francisco, Cal., for amici curiae Teamsters Joint Councils 7 and 38 and California Nurses Association.

Before GOODWIN, Chief Judge,
BROWNING, WALLACE, TANG,
FLETCHER, ALARCON, REINHARDT,
NOONAN, O'SCANNLAIN, LEAVY
and TROTT, Circuit Judges.

REINHARDT, Circuit Judge:

This case requires us to consider once again the nature and extent of the "public policy exception" to the finality of labor arbitrators' awards. In so doing, we reemphasize both the narrow manner in which we have historically construed that exception and the general deference we have afforded, and must afford, to the awards of labor arbitrators. Gale Rocks, an auto mechanic and member of appellant Lodge 1173 of the International Association of Machinists and Aerospace Workers ("Local" or "the union"), was discharged for work-related conduct. The matter was submitted to arbitration, and the arbitrator ordered Rocks reinstated to his former employment following a 120–day suspension. Appellee Stead Motors of Walnut Creek ("Stead Motors," "the employer"), sued to vacate the award in the United States District Court for the Northern District of California, alleging that Rocks' reinstatement would violate public policy by "endanger[ing] the health and safety of [its] customers and the public." The district judge apparently accepted this argument and vacated the portion of the award which ordered Rocks reinstated. A three-judge panel of this court affirmed. The case was then taken en banc. The original panel opinion, reported at 843 F.2d 357 (9th Cir. 1988), is withdrawn and we now reverse.

I.

Stead Motors sells Mercedes Benz automobiles; Gale Rocks services them. First employed as a mechanic by Stead Motors in 1977, Rocks performed his duties without incident until 1984.[1] In that year, Rocks received a written warning notice for failing properly to tighten the lug bolts on the wheels of a car he had serviced. The warning referred to Rocks' action as one of "gross negligence" and, according to the terms of the collective bargaining agreement ("the Agreement"), remained in effect for 30 days.

Approximately eleven months later, in September 1985, Rocks had a dispute with his shop foreman about the proper manner in which to tighten lug bolts after replacing the tires on a car. The arbitrator found that Rocks "was advised," although the record does not make clear precisely by whom, that his foreman had "absolute authority" over matters such as proper lug bolt tightening procedures. On October 14, 1985, Rocks replaced the front brake pads on a car, a job which required him to remove the wheels and, upon replacing them, to affix the lug bolts. As the car's owner drove home, he noticed a "very heavy" vibration in his car's front end. Stead Motors dispatched an employee to the customer's home. Upon inspecting the rough-riding Mercedes, the employee found that several lug bolts in both wheels were loose, with one bolt missing altogether.

Stead Motors, believing that Rocks's failure to secure the lug nuts amounted to "just cause" under the collective bargaining agreement, decided to terminate him.[2] In a letter to Rocks and his union dated the day after the incident, the employer referred to the written warning which had been issued a year before and claimed that

1. There is some discussion in the arbitrator's opinion and award about the relationship between Rocks' position as the union shop steward and his conflicts with management. We do not address these issues here, for neither party now alleges, nor did the arbitrator find, that Rocks' union activities were the basis for his discharge or for his employer's subsequent legal action to vacate the arbitrator's award.

2. Rocks, while admitting that he was the only person to service the vehicle in question, claimed before the arbitrator that someone else could have later loosened the lug bolts (specifically to get him in trouble with management). The arbitrator did not believe this claim and, in our review of his award, we take the facts as the arbitrator found them, *infra* at 1206–09, and assume that Rocks did in fact fail to affix the lug bolts properly.

Rocks' failure to tighten the lug bolts on the second car was "tantamount to recklessness," a category of behavior which entitled the employer to discharge an employee without notice. Rocks, through the union, sought to have an arbitrator determine whether the conduct on which Stead Motors had based his discharge amounted to just cause under the Agreement. Although the Agreement required such matters to be adjudicated by a board comprised of representatives of management and labor and a neutral member agreeable to both, the parties decided to submit the matter to a single neutral arbitrator. (Neither party has challenged the arbitration procedures employed, and we have no cause to question them either.)

The matter was heard before Arbitrator Robert Le Prohn, who subsequently issued a written opinion and award.[3] At the hearing Stead Motors had asserted three factors in support of its discharge decision: 1) the 1984 warning for lug bolt malfeasance; 2) Rocks' "attitude problems"; and 3) the "reckless" October 1985 failure to affix the lug bolts properly. With respect to the 1984 warning, Le Prohn found that the collective bargaining agreement clearly established that warning letters could not remain in effect for more than thirty days, making the year-old letter an improper factor on which to rely. As to Rocks' "attitude problems," the arbitrator ruled that Stead Motors' reliance on that factor was unwarranted. At the same time, he noted that, while the union had made out a prima facie case that Rocks' union activity was a motivating factor in Stead Motor's discharge decision, the record established that Rocks would not have been fired but for the October 14 lug bolt incident. (See supra n. 1.)

Turning to the final factor asserted by Stead Motors, that of the October lugs, Arbitrator Le Prohn first rejected the union's contention that Stead Motors should have been bound by its treatment of the similar incident for which it issued the written warning in 1984 as one of "gross negligence." He then ruled that Rocks' repeat offense suggested indifference to the consequences of his actions and was therefore properly deemed "reckless." Consequently, he reasoned, discipline was appropriate under the collective bargaining agreement.

The "Remedy" section of the arbitrator's award is the most important to our review; in some respects it is also the most confusing. We set out the relevant passages:

> One of the three bases relied upon by [Stead Motors] to support [Rocks'] removal has been established; two have not. [Stead Motors'] failure to establish that pursuant to the contract it was justified in relying on each of the factors leads to the conclusion that discharge is too severe a disciplinary action.

> [Rocks] is entitled to reinstatement to his former position. However, his reckless conduct on October 14, 1985[ ] warrants severe discipline.... Discipline is aimed at rehabilitation; reinstatement with a one-hundred and twenty (120) day suspension should serve as an object lesson and impress upon [him] that he is required to follow instructions and perform his job duties fully and carefully.

Stead Motors, dissatisfied with the outcome of the arbitration procedure, filed suit in the Superior Court of Contra Costa County, California to vacate the portion of the award that ordered Rocks reinstated. It argued that the arbitrator had exceeded his authority, that his award "d[id] not draw its essence from the Agreement," and that reinstatement would violate public policy inasmuch as it would allow Rocks to "endanger the lives and safety of the traveling public."

---

3. Admittedly, the arbitrator's opinion is in places somewhat cursory and in others nearly opaque. While it would of course make our limited review of the arbitrator's decision simpler if his findings were closer in substance or form to those we usually have when reviewing the decisions of district courts, we acknowledge, and discuss *infra* at 1206–07, that the goals of the arbitration process are better served when arbitrators are not constrained by technical requirements imposed by judges or the fear that their awards will be given less deference if they fail to meet the high standards we demand of the findings and orders of district judges. *Cf. infra,* at 1204 n. 5.

The union removed the action to federal court under 28 U.S.C. § 1441(a), on the ground that Stead Motors' claim was cognizable under the federal courts' original jurisdiction pursuant to § 301 of the National Labor Relations Act, 29 U.S.C. § 185.[4] The district judge issued an order vacating the arbitrator's award, to the extent that it ordered reinstatement, on public policy grounds.[5]

The union appealed to a three-judge panel of this court which affirmed the district court. *Stead Motors v. Automotive Machinists Lodge 1173*, 843 F.2d 357 (9th Cir. 1988). The panel's brief opinion found that reinstatement of Rocks would violate California's public policy "regarding automobile safety and maintenance," 843 F.2d at 359, a policy it gleaned from two sections of the California Code. Turning first to § 24002 of the state Vehicle Code, the panel reasoned that California's pronouncement that "[i]t is unlawful to operate any vehicle or combination of vehicles which is in an unsafe condition." amounted to an " 'express legislative recognition' " of the danger posed by improperly maintained vehicles. *Id.*, (quoting *Maloney v. Rath*, 69 Cal.2d 442, 448, 71 Cal.Rptr. 897, 900, 445 P.2d 513, 516 (1968)). The panel looked next to California's Automotive Repair Act, Business and Professions Code § 9880 *et seq.*, which established a state Bureau of Automotive Repair and provided for the inspection and certification of automobile repair facilities, and concluded that the Bureau's power to revoke the certification of a repair facility for cases of "gross negligence," § 9884.7(1)(e), meant that "Stead Motors could not have kept Rocks and stayed in business." 843 F.2d at 359.

We decided to rehear the matter en banc.

## II.

In reviewing the merits of Stead Motors' challenge to the arbitrator's award, we must acknowledge that the task is different from that which judges are accustomed to perform; for, when reviewing the award of an arbitrator chosen by the parties to a collective bargaining agreement, we are bound—under all except the most limited circumstances—to defer to the decision of another, even if we believe that the decision finds the facts and states the law erroneously. Possibly because the nature of our review in these cases is so unusual, there may be a tendency for judges, often with the most unobjectionable intentions, to exceed the permissible scope of review and to reform awards in our own image of the equities or the law. Consequently, cases like this one, which acquire the plenary

---

**4.** Section 301 provides:

**Suits by and against labor organizations**

(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

**5.** More precisely, the district judge signed a two-page order prepared by Stead's counsel. The order—supposedly the centerpiece of a court of appeals' review—does not contain any analysis of the arbitrator's award, no discussion of the legal standards which must be applied to such awards, and does not even specify the "public policy" violated by Rocks' reinstatement.

While we have acknowledged that the practice in which a prevailing party prepares a district judge's findings and order has some value in a limited class of cases, this court and the Supreme Court have consistently advised that the all too commonplace practice generally makes appellate review more difficult and invites distortion and overstatement by the prevailing party. *Compare Photo Electronics Corp. v. England,* 581 F.2d 772, 776–77 (9th Cir.1978) ("Wholesale adoption of the prevailing party's proposed findings complicates the problems of appellate review ... [but] may be permissible in cases 'involving highly technical issues such as may be involved in patent cases and complex scientific problems.' ") (quoting *Industrial Building Materials, Inc. v. Interchemical Corp.,* 437 F.2d 1336, 1339–40 (9th Cir.1970)) (citations omitted) *with Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 572, 105 S.Ct. 1504, 1510, 84 L.Ed.2d 518 (1985) (criticizing courts that adopt findings of prevailing party "particularly when those findings have taken the form of conclusory statements unsupported by citation to the record" and discussing "potential for over-reaching and exaggeration on the part of attorneys preparing findings of fact") *and Kern Oil & Refining Co. v. Tenneco Oil Co.,* 840 F.2d 730, 734 (9th Cir.) (generally disapproving of wholesale adoption of findings prepared by prevailing party), *cert. denied* — U.S. ——, 109 S.Ct. 378, 102 L.Ed.2d 367 (1988).

attention of our court, provide an opportunity to repeat and reemphasize the unique character of an arbitrator's function and the nearly unparalleled degree of deference we afford his decisions. We also specifically reaffirm this circuit's settled construction of the so-called "public policy exception" to the finality of arbitrator's awards in light of recent Supreme Court pronouncements.

We turn, then, first to a brief description of the role arbitration plays in the process of collective bargaining and the role of the arbitrator in defining collective bargaining agreements. Subsequently, we examine the process by which arbitrators arrive at their awards and the character of those awards themselves. Finally, we come to the role of judges in this scheme, reviewing the historical approaches of the Supreme Court and of this circuit to judicial review of arbitrator's awards. The discussion provides a necessary background to the narrow issue we must decide here—whether the arbitrator's reinstatement of Rocks violated "public policy." We provide the background in detail because, as the history of this case eloquently shows, ultimate questions in the arbitration sphere cannot be answered properly if divorced from an understanding of the nature of the arbitral process itself.

A. *Arbitration and Arbitrators in the Labor Context*

Arbitration is a central feature of the collective bargaining process, designed to function alongside the labor contract in maintaining equity and a balance of power in the workplace. Indeed, the mandatory and prearranged arbitration of grievances is a critical aspect of the parties' bargain, the means through which they agree "to handle the anticipated unanticipated omissions of the [collective bargaining agreement]." St. Antoine, *Judicial Review of Labor Arbitration Awards: A Second Look at Enterprise Wheel and Its Progeny*, 75 Mich.L.Rev. 1137, 1140 (1977) (*"Judicial Review"*). The arbitrator under such a scheme serves a function somewhat different from that served by the arbitrator in the commercial context. He does not merely provide an alternative means of resolving disputes, nor is he chosen simply for his expertise in a specific field or his ability to give definitive answers with greater efficiency and speed than the courts. *Cf. e.g. Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985) (arbitrating a commercial claim "trades the procedures ... of the courtroom for the simplicity, informality, and expedition of arbitration"). Unlike the commercial contract, which is designed to be a comprehensive distillation of the parties' bargain, the collective bargaining agreement is a skeletal, interstitial document. *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578, 580–81, 80 S.Ct. 1347, 1350, 1351–52, 4 L.Ed.2d 1409 (1960) (*"Warrior & Gulf"*). The labor arbitrator is the person the parties designate to fill in the gaps; for the vast array of circumstances they have not considered or reduced to writing, the arbitrator will state the parties' bargain. He is "the parties' officially designated 'reader' of the contract ... their joint *alter ego* for the purpose of striking whatever supplementary bargain is necessary" to handle matters omitted from the agreement. *Judicial Review*, 75 Mich.L.Rev. at 1140.

Since the labor arbitrator is designed to function in essence as the parties' surrogate, he cannot "misinterpret" a collective bargaining agreement. As Professor St. Antoine observes, "[i]n the absence of fraud or an overreaching of authority on the part of the arbitrator, he is speaking for the parties, and his award *is* their contract." *Id.* (emphasis in original)[6] Thus,

---

[6] Recognition of this fact is, of course, the conceptual underpinning for judicial deference to an arbitrator's award, discussed in detail *infra* at 1207–09. The exception to Professor St. Antoine's generally accurate assertion is the case in which the arbitrator's award "fails to draw its essence" from the collective bargaining agreement. This term is reserved for those egregious cases in which a court determines that the arbitrator's award ignored the plain language of the contract, that he "manifestly disregarded" the contours of the bargain ex-

what courts do when they review an arbitrator's award is more akin to the review of a contract than of the decision of an inferior tribunal: the award, just as a contract, is the expression of the parties' will and must be enforced as expressed unless illegal or otherwise void. Judicial "reinterpretation," no less than judicial reformation of a contract against the wishes of all the parties to it, is ordinarily an invalid exercise of our power. *See, e.g. San Francisco–Oakland Newspaper Guild v. Tribune Pub. Co.*, 407 F.2d 1327, 1327 (9th Cir.1969) (per curiam) ("It is the arbitrator's construction that was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him, because their interpretation of the contract is different than his."); *Louisiana–Pacific Corp. v. International Bhd. of Elec. Workers*, 600 F.2d 219, 226 (9th Cir.1979) (enforcing arbitrator's award since company, which "[a]t several stages ... made choices as to collective bargaining" strategy "must now abide the consequences of those choices"). Deference is premised on the simple notion that courts do not free the individual from his obligations merely because those obligations have turned sour on him. The labor arbitrator's award, often termed the rendering of "industrial justice," is simply a manifestation of the parties' obligations under their contract:

> Whatever the content or import of the challenged award, and however it may otherwise be described, the brand of industrial justice dispensed in that award is the precise brand the party assessed and agreed to purchase, eyes open, for better or for worse, for richer or for poorer.

Jones, *"His Own Brand of Industrial Justice": The Stalking Horse of Judicial Review of Labor Arbitration*, 30 UCLA L.Rev. 881, 893 (1983).

### B. The Arbitrator's Award

■ Arbitrators' awards are not judicial opinions. They are ad hoc documents which express the meaning of a collective bargaining agreement as applied to a particular set of facts. In contrast to judges, labor arbitrators are not bound by the strictures of precedent or by the record actually before them; nor are they generally subject to reversal by "superior tribunals" for errors of law or fact. *See infra* at 1207.

■ The content of arbitral opinions and awards often reflects the contrasts between judges and arbitrators, and between judicial and arbitral proceedings. Arbitrators are generally not lawyers. Even if an arbitrator happens to be a lawyer, it is more likely than not that he was chosen for his knowledge of the industrial "shop" rather than any general knowledge of the law that he might possess. *Cf. Warrior & Gulf*, 363 U.S. at 581–82, 80 S.Ct. at 1352–53. The proceedings the arbitrator conducts are generally informal, lacking most of the fixed rules of procedure and evidence under which lawyers and judges customarily operate. The opinion and award the arbitrator writes is a document intended to answer a specific question rather than set forth any legal principles. Accordingly, we do not require labor arbitrators to make the sorts of explicit or exhaustive "findings of fact" we demand of district courts; likewise, the reasons for arbitral rulings need not be spelled out in detail. Indeed, "[a]rbitrators have no obligation ... to give their reasons for an award" at all. *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960) ("*Enterprise Wheel*").

As to the bases for an arbitrator's award, commentators and courts have long recognized that the arbitrator is entitled, and is even expected, to range afield of the actual text of the collective bargaining agreement he interprets:

> The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally part of the collective

pressed in outline by the collective bargaining agreement. In such an instance, the court rules that the arbitrator's award represents an invalid

exercise of the power the parties have entrusted to him. *See infra* at 1208–1209.

bargaining agreement although not expressed in it.

*Warrior & Gulf*, 363 U.S. at 581–82, 80 S.Ct. at 1352–53. Such a construction of the contract and the arbitrator's function is required by the nature of the bargaining process itself. Since labor contracts are negotiated and "written with industrial practices and psychology in mind," arbitrators must draw from their personal knowledge of the workplace and the relevant industry when they make their awards. *Judicial Review*, 75 Mich.L.Rev. at 1147–48; *see also Pacific Northwest Bell Tel. Co. v. Communications Workers of Am.*, 310 F.2d 244, 246 (9th Cir.1962) ("collective bargaining contracts by their very nature cannot fairly be limited to their express provisions").

C. *Judicial Review of Arbitrators' Awards*

■ The implication of the preceding section for a court reviewing the award of a labor arbitrator is clear. Unfamiliar with "the practices of the industry and the shop," courts are not competent to second-guess an arbitrator's judgment. Furthermore, since there is nothing proscribed, or even imprudent, about the taking of "arbitral notice" in the formulation of an arbitral award and no requirement (or even a reasonable expectation) that an arbitrator write an exhaustive "opinion," a court often has no principled ground upon which to question an arbitrator's *ratio decidendi*. More importantly, a court is barred from disregarding the arbitrator's factual determinations, let alone supplementing them with its own, or from "correcting" an arbitrator's erroneous understanding of the law. *Sheet Metal Workers v. Arizona Mechanical & Stainless, Inc.*, 863 F.2d 647, 653 (9th Cir.1988) ("*Sheet Metal Workers*"); *American Postal Workers Union v. United States Postal Service*, 682 F.2d 1280, 1284 (9th Cir.1982), *cert. denied*, 459 U.S. 1200, 103 S.Ct. 1183, 75 L.Ed.2d 431 (1983).[7]

This approach to judicial review of labor arbitration awards found its first important expression in three 1960 Supreme Court cases, two of which have been mentioned already, which have come to be known as the *"Steelworkers Trilogy."* Accordingly, any discussion of judicial review issues should include a description of Justice Douglas' opinions for the Court in *Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960) ("*American Manufacturing*"); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) (treated in a related context, *supra*, at 1205–06); and *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

In *American Manufacturing*, the Court expressed for the first time the proposition that courts must refrain from "depriving" a party to a collective bargaining agreement of its right to a hearing before an arbitrator. The Court, emphasizing the "therapeutic values" of arbitrating even seemingly frivolous claims, 363 U.S. at 567–68, 80 S.Ct. at 1346–47, ruled that enjoining arbitral proceedings would be improper even in a case in which the appropriate resolution of the issues would ordinarily be deemed to be "beyond dispute."

*Warrior & Gulf* explained the unique character of the collective bargaining agreement; "more than a contract," the agreement has to be seen as "a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." 363 U.S. at 578, 80 S.Ct. at 1350. The opinion then proceeded at some length to discuss the wide range of permissible sources of law for the arbitrator, *supra* at 1206, advising courts not to be suspicious of arbitrators' awards or hesitant to enforce them merely because an arbitrator's actions might not track those of courts faced with

---

7. In one case, we affirmed a district court decision vacating an arbitral award on the basis of a factual finding made by the *district court* that was contrary to the implicit findings of the arbitrator. *World Airways, Inc. v. International*

*Bhd. of Teamsters*, 578 F.2d 800, 802 (9th Cir. 1978) (per curiam). To the extent the case validated this clearly forbidden practice, we disapprove it.

analogous situations, or because the arbitrator's judgments seem "foreign to the competence" of the federal courts. *Id.* at 580–81, 80 S.Ct. at 1351–52. Finally, the *Warrior & Gulf* court returned to its comparison of the relative competence of courts and arbitrators in the labor field, concluding that "[t]he ablest judge cannot be expected to bring the same experience and competence [possessed by an arbitrator] to bear upon the determination of a grievance, because he cannot be similarly informed [of the "common law of the shop" and the "specialized needs" of the parties]." *Id.* at 582, 80 S.Ct. at 1352.

■ In terms of import for judicial review of arbitration awards, the most significant case in the *Trilogy* was *Enterprise Wheel.* In straightforward, almost terse, language the Court reasoned that the "federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of awards." 363 U.S. at 596, 80 S.Ct. at 1360. Thus, outright "refusal to review the merits" of arbitrators' awards was normally "the proper approach" for courts to follow when a disgruntled party sought to challenge them. *Id.* The only time in which a court could, and indeed was obligated to, refuse to enforce the arbitrator's award was in those cases in which the arbitrator had "dispense[d] his own brand of industrial justice," issuing an award which failed to "draw[ ] its essence from the collective bargaining agreement." *Id.* at 597, 80 S.Ct. at 1361.[8]

The Court was equally categorical in its treatment of judicial second-guessing of the remedy formulated by an arbitrator, stressing the arbitrator's "need ... for flexibility in meeting a wide variety of situations" and the deference to be afforded the arbitrator's use of "his informed judgment ... to reach a fair solution of a problem." *Id.* In *Enterprise Wheel,* the arbitrator found discharge an inappropriate punishment for several employees who had left their jobs to protest the firing of a co-worker, but had immediately returned to work when advised by their union to do so. In the Court's words, "[i]n [the arbitrator's] view, the facts warranted at most a suspension of the men for 10 days each." *Id.* at 595, 80 S.Ct. at 1360. The Court ruled definitively that the arbitrator's decision to reinstate the employees following the 10–day suspensions was not subject to review, except insofar as the court was allowed to ensure that the award had "drawn its essence" from the arbitrator's construction of the contract. A reviewing court, moreover, was strictly forbidden to reject the arbitrator's choice of punishment "merely [because it] disagreed" with it. 363 U.S. at 598, 80 S.Ct. at 1361.

Finally, the *Enterprise Wheel* court referred to two temptations to which courts might fall prey, both of which have already been discussed briefly above. Looking first at the acknowledged likelihood that the written renderings of some awards might be ambiguous, the Court advised that "mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award." 363 U.S. at 598, 80 S.Ct. at 1361; *cf. supra* at 1203 n. 3 and 1207. General references to "ambiguity" were not to serve as excuses for judicial rehearing of a grievance. Second, the Court explicitly commented on the "misinterpretation" problem discussed already (at

---

**8.** Much has been made of these two cryptic phrases. *See, e.g.* Jones, *supra* at 12, 30 UCLA L.Rev. at 882–85 (referring to the "his own brand" test as "a semantic slip noose around the exercise of arbitral judgment"). Indeed, the quotation of these phrases, unaccompanied by further explanation, usually serves as an indicator that a court is about to vacate an arbitrator's award. *E.g., S.D. Warren Co. v. United Paperworkers' Intern. Union, AFL–CIO, Local 1069,* 845 F.2d 3, 8 (1st Cir.) (decided on "essence" grounds after the court's earlier decision on public policy grounds, 815 F.2d 178 (1st Cir. 1987), was vacated by the Supreme Court, 484 U.S. 983, 108 S.Ct. 497, 98 L.Ed.2d 496 (1987)), *cert. denied,* —— U.S. ——, 109 S.Ct. 555, 102 L.Ed.2d 582 (1988). We believe that courts must apply the "his own brand" or "draw its essence" exceptions to judicial deference in the same way in which we have held that they must apply the "public policy" exception. In both circumstances, "[j]udicial scrutiny of an arbitrator's decision is *extremely* limited." *Sheet Metal Workers,* 863 F.2d at 653 (emphasis supplied).

1205–06). In terms which admit of no dispute, the Court cautioned:

> It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

*Id.* at 599, 80 S.Ct. at 1362.

This circuit has adhered to, and elaborated on, the spirit of the *Trilogy*'s admonitions. A recent decision aptly summarizes our approach to judicial review of arbitration awards:

> Judicial scrutiny of an arbitrator's decision is extremely limited. The arbitrator's factual determinations and legal conclusions generally receive deferential review as long as they derive their essence from the [collective bargaining agreement]. If, on its face, the award represents a plausible interpretation of the contract, judicial inquiry ceases and the award must be enforced. This remains so even if the basis for the arbitrator's decision is ambiguous and notwithstanding the erroneousness of any factual findings or legal conclusions.

*Sheet Metal Workers,* 863 F.2d at 653 (citations omitted).

At times, we have expressed these propositions in slightly different, though substantively indistinguishable, terms. *See, e.g., Pack Concrete, Inc. v. Cunningham,* 866 F.2d 283, 285 (9th Cir.1989) (emphasizing the "extremely narrow" scope of review of arbitral decisions); *Local Joint Executive Bd. of Las Vegas v. Riverboat Casino, Inc.,* 817 F.2d 524, 526–27 (9th Cir. 1987) ("not the court's role to determine whether the arbitrator has reached the same result the court would have reached") (citations omitted); *Orange Belt Dist. Council of Painters No. 48 v. Kashak,* 774 F.2d 985, 990 (9th Cir.1985) ("*Orange Belt*") (arbitral award must be enforced " 'even if the basis for the decision is ambiguous, and notwithstanding the errone-

ousness of any factual findings or legal conclusions' ") (quoting *George Day Construction Co. v. United Bhd. of Carpenters and Joiners of Am., Local 354,* 722 F.2d 1471, 1477 (9th Cir.1984)); *Broadway Cab Co-op. v. Teamsters & Chauffeurs Local Union No. 281,* 710 F.2d 1379, 1382 (9th Cir.1983) (federal court "ordinarily engages in only a very limited review of an arbitrator's decision," reviewing "the arbitrator's resolution of [a] question under the *Steelworkers Trilogy* standard even if the question is one that is ordinarily for the courts to decide") (citations omitted).

There is no orthodoxy with respect to the manner in which courts must express their deference to arbitrators' awards and no problem with varying expressions so long as the scope or degree of deference is not diminished. What is important is that the language recited at the beginning of our opinions not be forgotten when it comes time to apply those principles to the facts of the individual case. Deference is the rule; rare indeed is the exception.

### D. *The Public Policy Exception*

■ One of the exceptions to the requirement that courts defer to the awards of arbitrators is the now-settled rule that a court need not, in fact cannot, enforce an award which violates public policy.[9] The contours of this exception as applied in the arbitration context were first outlined by the Supreme Court in *W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) ("*Grace*"). In *Grace,* the Court dealt with a conflict between a collective bargaining agreement, which gave seniority to certain male employees, and a consent decree between the employer and the EEOC designed to settle a sex discrimination suit under Title VII. When the male employees lost the seniority guaranteed by the collective bargaining agreement because of the implementation of the consent decree, they sought arbitration. An arbitrator held that, irrespective of the consent decree, the employer had

---

**9.** As many have recognized, this "exception" is actually nothing more than a specific application of the general rule that a court cannot

enforce any contract that contravenes public policy. *Judicial Review,* 75 Mich.L.Rev. at 1155; 6A *Corbin on Contracts* § 1375 at 10 (1962).

breached the seniority provisions of the agreement and ruled for the employees. 461 U.S. at 759–64, 103 S.Ct. at 2179–82.

In the course of confirming enforcement of the arbitration award, the Court discussed the public policy exception. Beginning with the proposition that, "[a]s with any contract ... a court may not enforce a collective-bargaining agreement that is contrary to public policy," the Court ruled that questions of public policy were properly answered in the courts and that, if a court found that an arbitral award violated public policy, it would be "obliged to refrain from enforcing it." *Id.* at 766, 103 S.Ct. at 2183.

The Court then sought to give some content to the term "public policy." For an asserted public policy to be sufficient to preclude enforcement of an arbitrator's award, it had to be "explicit;" furthermore, it had to be "well defined and dominant." *Id.* Finally, such a policy could be satisfactorily demonstrated only " 'by reference to the laws and legal precedents' " and could not be the product of the parties' or the courts' " 'general considerations of supposed public interests'." *Id.* (quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)).

Although *Grace*'s careful description of "public policy" was intended to constrain the application of the public policy exception, the Court's explicit recognition of the exception had a countervailing impact in the lower courts, and "public policy" became a favorite pretext for those less than favorably disposed to the awards of labor arbitrators. This reaction prompted a more definitive statement from the Court in *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) (*"Misco"*). In *Misco,* an employee was discharged after marijuana was found by police in his home and a marijuana cigarette was seen in a car in which he was sitting. The employee's job duties included operating a

"slitter-rewinder," a machine the arbitrator termed "hazardous." The arbitrator ordered reinstatement with backpay, finding that the employer had failed to prove that the employee had actually possessed or used illegal substances while on company property and thus that he had violated any company rule. 108 S.Ct. at 368–69, 374.

The Fifth Circuit had affirmed a district court decision vacating the award, reasoning that reinstatement would violate the public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." *Misco, Inc. v. United Paperworkers Intern. Union,* 768 F.2d 739, 743 (5th Cir.1985).[10] The Supreme Court unanimously reversed, holding that the circuit court had failed to follow the dictates of *Grace* with respect to the articulation and application of a public policy necessitating the invalidation of the arbitrator's award.

The Court began by reaffirming the "explicit" and "well defined and dominant" requirements expressed in *Grace,* 108 S.Ct. at 373, saying that the result in that case had "turned on [its] examination of whether the award created any explicit conflict with other 'laws and legal precedents' rather than an assessment of 'general considerations of supposed public interest.' " *Id.* (quoting *Grace,* 461 U.S. at 766, 103 S.Ct. at 2183). "At the very least," Justice White continued for the Court, "an alleged public policy must be framed under the approach set out in *W.R. Grace,* and the violation of such a policy must be clearly shown if an award is not to be enforced." *Id.* 108 S.Ct. at 373–74.

The Court concluded that the Fifth Circuit's articulation of a general "public policy" against drug use by employees violated the strict requirements of the *Grace* formulation; that no violation of the public policy it articulated had been "clearly shown" in any case; and that the circuit

---

**10.** The Fifth Circuit apparently assumed that the arbitrator's award meant that, upon reinstatement, the employee would return to his "slitter-rewinder," 768 F.2d at 740–41, while the Supreme Court interpreted the award to order reinstatement to the employee's "old job or ...

an equivalent one for which he was qualified." 108 S.Ct. at 374. As neither opinion recites the text of the award, we are unable to determine with assurance precisely to what the arbitrator reinstated the employee.

court had, in the course of its public policy analysis, improperly drawn an inference (that the employee was in fact using drugs in the workplace) at odds with the findings of the arbitrator. 108 S.Ct. at 374. Explicitly disapproving the latter endeavor, the Court said:

> The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them ... Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task.

*Id.*

Finally, in words reminiscent of its discussion more than a quarter century earlier in *Enterprise Wheel* (*supra* at 1208–1209), the Court reaffirmed the deference to be afforded an arbitrator's choice of remedy:

> Had the arbitrator found that [the employee] had possessed drugs on the property, yet imposed discipline short of discharge because he found as a factual matter that [he] could be trusted not to use them on the job, the Court of Appeals could not upset the award because of its own view that public policy about plant safety was threatened.

108 S.Ct. at 374.[11]

The *Misco* court expressly reaffirmed *Grace* in rejecting the notion that there existed any "broad judicial power to set aside arbitration awards as against public policy." 108 S.Ct. at 373. More important for our purposes, it explicitly contrasted the "broader view" of court power which it implicitly rejected later in the opinion with the "narrower view" taken historically in this circuit and the D.C.Circuit. 108 S.Ct. at 369 n. 7, 373 (citing *Bevles Co. v. Teamsters Local 986*, 791 F.2d 1391 (9th Cir. 1986), *cert. denied*, 484 U.S. 985, 108 S.Ct. 500, 98 L.Ed.2d 499 (1987), and *Northwest*

*Airlines, Inc. v. Air Line Pilots Ass'n Int'l*, 808 F.2d 76 (D.C.Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988)). Our "narrow view" is one we reemphasize today.

In *Bevles*, we refused to vacate an arbitrator's award on public policy grounds, noting both the limited nature of our review of such awards in general and the failure of the employer challenging the award to meet the "explicit, well defined and dominant" public policy standard set forth in *Grace*. 791 F.2d at 1392–93 & n. 2. *Bevles* sits squarely within a line of cases in which we have adhered to a narrow construction of the public policy exception. *See e.g. Orange Belt*, 774 F.2d at 990 (quoting and citing *George Day Construction Co.*, 722 F.2d 1471, 1477 (9th Cir.1984)). *Cf. American Postal Workers*, 682 F.2d at 1286 (arbitration award will not be enforced if it would force a party to perform a manifestly illegal act).

The case most critical to our decision today is *Amalgamated Transit Union v. Aztec Bus Lines*, 654 F.2d 642, 643–44 (9th Cir.1981) (per curiam) ("*Aztec Bus Lines*"). In *Aztec Bus Lines*, we refused to vacate the award of an arbitrator who had ordered reinstatement following a suspension for a bus driver who had knowingly driven a bus whose faulty brakes caused it to "dive and rock." In that case, the driver had even been advised by a police officer not to continue to operate the bus "if there was any question as to its safety." 654 F.2d at 643. Although the case preceded both *Misco* and *Grace*, we recognized that *Enterprise Wheel* itself forbade judicial reevaluation of the arbitrator's chosen remedy and that the employer's claim that reinstatement would violate public policy was flawed and inadequate. In words that foreshadow our decision today, we wrote:

---

**11.** In a footnote, the *Misco* court said that it was reserving the question whether refusal to enforce an award on public policy grounds *required* a showing that the "award itself violates a statute, regulation, or other manifestation of positive law, or compels conduct by the employer that would violate such a law." 108 S.Ct. at 374–75 n. 2. We do not read this footnote as in any way compromising the Court's reaffirmation of *Grace's* "explicit, well defined and dominant" standard, let alone detracting from the opinion's untempered rebuke of courts that find facts or draw inferences concerning an arbitrated grievance beyond those expressed in the text of the arbitral award itself. Nor do we read it as calling into question the proposition that, however the public policy itself is established, it is the arbitrator's *award* which must violate it if the public policy exception is to apply.

[N]o California statute has been called to our attention which would make it illegal to employ bus drivers who have previously shown bad judgment. Furthermore, the arbitrator did not approve of [the bus driver's] behavior. He merely concluded that, under the circumstances, a two week suspension without pay rather than outright dismissal was an adequate sanction. Even if we agreed with the employer that a more severe sanction was appropriate, we are not permitted to review the merits of an arbitral award. Public policy should not be turned into "a facile method of substituting judicial for arbitral judgment."

*Id.* at 644 (quoting Dunau, *Three Problems in Labor Arbitration*, 55 Va.L.Rev. 427, 446 (1969)) (citation omitted).

### III.

We turn, then, to Gale Rocks, the loose lugs and the arbitrator's reinstatement of him after a one hundred-twenty day suspension. We must now apply the general rules with respect to arbitral awards, and our review of them, discussed above. In so doing, we must follow the dictates of *Grace* and *Misco* and this circuit's "narrow view" of the judicial power to vacate an arbitral award on public policy grounds.

■ As we see this case, application of the public policy exception ultimately presents one specific question: does the arbitrator's order reinstating (following a disciplinary suspension) an auto mechanic who committed a reckless act violate an "explicit, well defined and dominant" public policy? We think the answer to this question is clearly in the negative.

■ Leaving for discussion below whether the purported public policy articulated by the panel which originally heard this case satisfied the *Grace–Misco* standard, we consider briefly the first inquiry courts must make in cases of this kind—an inquiry often neglected. Simply put, a public policy *in favor of or against what*? In our view, only one answer comports with *Misco*, and with our narrow rule. If a court relies on public policy to vacate an arbitral award reinstating an employee, it must be a policy that bars *reinstatement.*[12] Courts cannot determine merely that there is a "public policy" against a particular sort of behavior in society generally and, irrespective of the findings of the arbitrator, conclude that reinstatement of an individual who engaged in that sort of conduct in the past would violate that policy.[13] In our view, a faithful reading of *Misco* requires something more. A court must both delineate an overriding public policy rooted in something more than "general considerations of supposed public interests," and, of equal significance, it must demonstrate that the policy is one that specifically mili-

---

**12.** There is no reason for us here to consider, and we therefore leave open, the question reserved by the *Misco* court: whether a party attempting to show that an arbitrator's award contravenes public policy must demonstrate that enforcement of the award would actually violate "a statute, regulation or other manifestation of positive law." 108 S.Ct. at 374–75 n. 12, *supra* at 1211 n. 11. We note, however, that at least one circuit, whose approach to this question was deemed to represent the "narrower view" implicitly endorsed by the *Misco* court, has adopted a test which nears this standard. *U.S. Postal Serv. v. National Ass'n of Letter Carriers*, 810 F.2d 1239, 1241–42 (D.C.Cir.1987) (refusing to vacate arbitral award given the fact that there was " 'no legal proscription against the reinstatement of a person such as the grievant[, a]nd the award did not otherwise have the effect of mandating any illegal conduct' ") (quoting *American Postal Workers Union v. United States Postal Serv.*, 789 F.2d 1, 8 (D.C.Cir.1986)),

cert. *granted,* 484 U.S. 984, 108 S.Ct. 500, 98 L.Ed.2d 499 (1987), cert. *dismissed,* 485 U.S. 680, 108 S.Ct. 1589, 99 L.Ed.2d 770 (1988); *see also* E.I. DuPont de Nemours & Co. v. Grasselli Emp. Ass'n., 790 F.2d 611, 620 (7th Cir.) ("[t]he question is whether the contract, as construed, violates positive law"), cert. *denied,* 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986), (Easterbrook, J., concurring).

**13.** But cf. United States Postal Serv. v. National Ass'n of Letter Carriers, 847 F.2d 775, 777 (11th Cir.1988) (noting "considerable merit" in the argument that "a public interest in not having postal employees who steal from the mail ... brings a public policy to bear on this case"). In the Eleventh Circuit's *Postal Service* case, the arbitrator had ordered reinstatement, given the employer's violation of certain procedural rights guaranteed to the grievant. Because of the existence of other dispositive issues, the circuit court did not actually rule on the public policy question.

tates against the relief ordered by the arbitrator. *See Misco,* 108 S.Ct. at 374; *see also Grasselli Emp. Ass'n,* 790 F.2d at 615–16 (7th Cir.1986) (refusing to second-guess arbitrator's reinstatement order given employer's failure to show that reinstatement would, in itself, violate public policy).

■ Ordinarily, a court would be hardpressed to find a public policy barring reinstatement in a case in which an arbitrator has, expressly or by implication, determined that the employee is subject to rehabilitation and therefore not likely to commit an act which violates public policy in the future. As *Misco* recognized, an arbitral judgment of an employee's "amenability to discipline" is a factual determination which cannot be questioned or rejected by a reviewing court. 108 S.Ct. at 374; *see also United States Postal Serv. v. National Ass'n of Letter Carriers,* 839 F.2d 146, 149 (3d Cir.1988). Judgments about how a specific employee will perform after reinstatement if given a lesser sanction are nothing more than an exercise of the arbitrator's broad authority to determine appropriate punishments and remedies. *See Misco,* 108 S.Ct. at 372; *Enterprise Wheel,* 363 U.S. at 597, 80 S.Ct. at 1361 (general proposition that courts must allow an arbitrator to use his "informed judgment ... to reach a fair solution of a problem" is "especially true when it comes to formulating remedies"); *supra* at 1208. This rule is supported by the significant societal interest in the rehabilitation of workers who err in the workplace. All of us benefit from employees who perform their jobs safely and properly. All of us suffer when potentially productive workers are relegated to the unemployment lines.

Ours is one of the cases of which *Misco* spoke. Arbitrator Le Prohn indicated that Rocks could be rehabilitated, stating that "[d]iscipline is aimed at rehabilitation; reinstatement with a one-hundred and twenty (120) day [sic] suspension should serve as

an object lesson and impress upon [Rocks] that he is required to follow instructions and perform his job duties fully and carefully." In the face of this statement, we are forbidden to substitute our judgment about Rocks' susceptibility to rehabilitation or about whether 120 days, as opposed to 90 days, 150 days, or forever, is the length of "non-employment" necessary to ensure that he learns his "object lesson."

Bearing in mind what we have emphasized already about the character of arbitrators' written awards, it should be clear that we do not require an express "finding" that a grievant can be rehabilitated or, to borrow from the *Misco* court, is otherwise "amenabl[e] to discipline." *See supra* at 1210. We apply the same deferential review to an award's statements concerning rehabilitation that we apply to other aspects of the award. Even if we were to view the reference to rehabilitation in the award as nothing more than an abstract observation, we would be required to reach the same result. A court cannot infer, from the mere fact that an award orders reinstatement but is silent on the subject of a grievant's rehabilitation or "amenability," that the arbitrator did not consider the question; nor can it make an independent judgment in such a case. Simply put, we look to the text of the arbitral award for an expression of an arbitrator's reasons for his decision, but we do not infer the non-existence of a particular reason merely from the award's silence on a given issue. Indeed, the Supreme Court has determined that a court cannot set aside an arbitrator's award which, far from merely being silent, was affirmatively ambiguous, and arguably supported a claim that the arbitrator had exceeded his authority. *Enterprise Wheel,* 363 U.S. at 598, 80 S.Ct. at 1361 (court cannot infer that arbitrator exceeded his authority merely because his award gives ambiguous support for the proposition). Unquestionably, then, Arbitrator Le Prohn's references to rehabilitation are more than sufficient.[14]

14. We need not consider here the power of the court to vacate an arbitral award in the case where the arbitrator has concluded that the grievant is *not* subject to rehabilitation and then

orders reinstatement (on the ground, for example, of a procedural or contractual violation by the employer in the course of the discharge) even though the grievant's future conduct is

There are two decisions by courts of appeals in other circuits that, even while acknowledging the proscriptions of *Grace* and *Misco*, have overturned arbitrators' orders of reinstatement on public policy grounds. *Delta Air Lines v. Air Line Pilots Ass'n Int'l*, 861 F.2d 665, 671–74 (11th Cir.1988), and *Iowa Elec. Light & Power v. Local Union 204, of Int'l Bhd. of Elec. Workers*, 834 F.2d 1424, 1427–29 (8th Cir.1987). In *Iowa Electric*, the Eighth Circuit concluded that there was "a well defined and dominant national policy requiring strict adherence to nuclear safety rules," *Id.* at 1427, and refused to allow reinstatement of a nuclear power plant employee who had compromised a reactor safety system in order to leave for lunch early, despite an arbitrator's finding that termination for this "deliberate violation" was "too severe" a sanction. 834 F.2d at 1426. In *Delta*, the Eleventh Circuit vacated an arbitrator's order reinstating a commercial airline pilot who had flown his plane while drunk, finding a public policy sufficient to vacate the order of reinstatement from the fact that the laws of almost every state and the federal government made operating an aircraft while intoxicated illegal. 861 F.2d at 672–74.

These are "hard" cases, reflecting situations in which the lives of many people may have been directly placed at risk by the actions of the employees in question. Be that as it may, to the extent that these cases apply analyses inconsistent with our reading of *Misco*, we decline to follow them. On the other hand, it is possible that the Eighth and Eleventh Circuit results can be explained by reference to theories which, though unaddressed in *Misco*, are not necessarily inconsistent with it.

First, with respect to the Eighth Circuit's decision, it is conceivable that a court could, upon examining the regulatory scheme, conclude that a public policy exists with respect to the nuclear power industry barring reinstatement of *anyone* who has compromised a safety rule. It may be reasonable to infer, from a careful consideration of the nature and scope of the statutes

and regulations themselves, a public policy both more strict and of far wider application than that applicable to other industries. We see support for this theory in the two Eighth Circuit cases dealing with nuclear power plants. In *Iowa Electric*, the court began its discussion of public policy with a detailed description of federal regulation of the industry, noting that the government had been "heavily involved in the planning, construction, and operation of nuclear plants since the enactment of the Atomic Energy Act and creation of the Atomic Energy Commission [the forerunner of the current Nuclear Regulatory Commission (NRC)] in 1954." 834 F.2d at 1428. The "strict regulatory scheme," the court observed, had been "devised by Congress for the protection of the public from the hazards of nuclear radiation." *Id.* Federal involvement was so pervasive that "[a]ny violation of any rule[ ]" had to be reported to the NRC, which, in turn, was required to issue penalties against the facility. *Id.* Similarly, the other Eighth Circuit case dealing with the nuclear power industry, *Daniel Construction Co. v. Local 257, IBEW*, 856 F.2d 1174 (8th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1140, 103 L.Ed.2d 200 (1989), detailed the NRC's involvement in setting standards for nuclear plant security even to the point of issuing criteria for the administration of mandatory psychological tests for those who would be in "sensitive" positions within the plant. *Id.* at 1176. We need not, and do not, determine whether the unique safety concerns embodied in the regulations and statutes governing the nuclear power industry are sufficient to establish a public policy barring reinstatement of employees who commit safety violations. We merely offer one possible explanation for the Eighth Circuit's decision in *Iowa Electric*.

Second, although in a similar vein, the court in *Iowa Electric* was writing against a backdrop of explicit agency action with respect to the parties and the incidents in question. The NRC had explicitly reprimanded the employer for its employee's breach of reactor safety and approved the

likely to pose a continuing safety risk to his    co-workers or the public.

discharge. 834 F.2d at 1428. The validation of the employer's discharge decision by the federal regulator might reasonably be construed as an "explicit, well defined and dominant" expression of a public policy as applied to the facts of the case. Viewing the NRC's actions from this perspective, the arbitrator's reinstatement award might be said to have violated public policy, albeit the ad hoc one expressed through a specific regulatory determination regarding the grievant.

A similar rationale might also explain how, on its particular facts, the Eleventh Circuit's *Delta* panel *could have* reached the result it did and still have persuasively distinguished the apparently conflicting result of a decision of the D.C. Circuit (cited in *Misco* as illustrative of the narrow rule the Court ultimately approved, 108 S.Ct. at 369 n. 7) which ordered reinstatement of a commercial airline pilot who had admitted to flying his plane while drunk on several occasions. *Northwest Airlines v. Air Line Pilots Ass'n, Int'l,* 808 F.2d 76, 78–79 (D.C. Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988). There is an important factual difference between the two cases directly relevant to our discussion of the potential significance of specific agency action for individual public policy determinations. In *Northwest,* the Federal Aviation Administration ("FAA") had recertified the pilot following his completion of an alcohol rehabilitation program. This recertification represented a specific conclusion that, in the view of the federal regulator, the pilot was "fit and qualified to fly." 808 F.2d at 83. (Indeed, the arbitration board in that case had conditioned its reinstatement award on FAA recertification. *Id.*) In *Delta,* the FAA had suspended the grievant's license and medical certification, 861 F.2d at 668 n. 3, indicating that in its view he was neither "fit" nor

"qualified" to do so. Taken together, the *Iowa Electric, Delta,* and *Northwest* cases would appear to support a notion that specific action by a regulatory or other administrative agency might provide some form of ad hoc "legal precedent" within the meaning of *Grace* and *Misco* sufficient to justify invalidation of an award on public policy grounds.[15]

Notwithstanding the above, we must conclude that the Eleventh Circuit's opinion in *Delta* is, to a large extent, simply inconsistent with the law as expressed in *Grace* and *Misco.* The Eleventh Circuit did not rely on the FAA's determination, alluding to it only in passing in a footnote. 862 F.2d at 668 n. 3. Instead, the *Delta* court reasoned that, since what the pilot had done in flying drunk was illegal, the "performance of his employment [was] the very thing which offends public policy" and thus reinstatement was impermissible. 861 F.2d at 674. As we have explained, the critical inquiry is not whether the underlying act for which the employee was disciplined violates public policy, but whether there is a public policy barring *reinstatement* of an individual who has committed a wrongful act. *Grace,* 461 U.S. at 766, 103 S.Ct. at 2183; *Misco,* 108 U.S. at 373, *supra* at 1212–13. Besides being inconsistent with the Supreme Court's determination that it is enforcement of the award which must be deemed violative of public policy, we think the Eleventh Circuit's approach would produce, at best, curious results. If the performance of an illegal act while on the job is all that must be proved to demonstrate the violation of a public policy for purposes of *Grace* and *Misco,* then an arbitrator would be *prohibited* from reinstating any teamster who receives a speeding ticket while driving the company truck, or even an inventory clerk who commits a single act of petty theft.[16] *Grace* and *Misco* do not

**15.** Again, we emphasize that we do not decide whether public policy can be expressed by specific agency action in individual cases. The cases discussed in the text raise an interesting and difficult question in this regard. None of the decided cases provides a clear answer, let alone one binding on this circuit. The answer to the question they raise will have to await a case in which the issue is squarely presented.

**16.** The dissent's treatment of this observation reveals the fatal limitations of the approach it advocates. The dissent explicitly endorses the *Delta* court's rationale, quoting, even underlining, that portion of the Eleventh Circuit opinion which precludes arbitrators from reinstating those employees who engage in "disfavored conduct which is integral to the performance of employment duties." (Dissent at 1221, quoting

countenance such results.[17]

Returning to the rationales which, we suggested, might explain the results in *Iowa Electric* and *Delta*, we note that Rocks' case does not fit within either one. First, while the automotive repair industry is regulated by the state and while we do not minimize the risk that an improperly maintained automobile can cause injury to its occupants or to others, the nuclear power industry is unique both with respect to the magnitude of the risk that results from negligent or reckless employee conduct and the comprehensiveness of governmental regulation. Second, there has been no specific agency determination in Rocks' case. Stead Motors has never claimed that the Bureau of Automotive Repair or some other California regulatory entity has sought to terminate Rocks' right to work as a mechanic because of his conduct in relation to the lug bolt incident; nor has it contended that the agency has taken any action against it. These observations lead us to conclude that the Eighth and Eleventh Circuit cases, while thought provoking, are of at best marginal relevance to our inquiry.

We stand at last before the ultimate question: is there an explicit, well defined and dominant public policy in California that bars reinstatement of a mechanic who commits a reckless act in the course of his employment? Simply put, we think not.

We have found nothing in the record of this case, in the arguments of counsel, or in our inquiry into the "laws and legal prece-

dents" of California which supports the existence of the specific public policy necessary to justify vacating the arbitral award in this case. The two sections of the California Code discussed above (at 1204) neither constitute the sort of laws and legal precedents necessary for the valid expression of an "explicit, well defined and dominant" public policy nor are they sufficiently directed at the type of problem before us. They do make it unlawful to operate a vehicle "which is in an unsafe condition" and they do establish a state bureau to inspect and certify auto repair facilities. Violations of the regulations promulgated by the bureau can be sanctioned in a variety of ways, the harshest of which is revocation of the facility's certification. *See* California Vehicle Code § 24002; Business and Professions Code § 9880, 9884.7. These provisions may signify the legislature's perception of a broad public interest in safe cars and trucks; as such they would represent the state's general policy, the expression of its "general consideration of supposed public interests." The provisions represent precisely what *Misco* and *Grace* tell us is insufficient to form an "explicit well defined and dominant" public policy. 461 U.S. at 766, 103 S.Ct. at 2183; 108 S.Ct. at 373.

More important, there has been no showing that Rocks' *reinstatement* violates public policy. To borrow and modify the language of *Aztec Bus Lines*, "no California [policy] has been called to our attention which would make it illegal to employ [an

*Delta*, 861 F.2d at 671.) Nonetheless, when confronted with two common examples of the results this approach would require, the dissent beats a hasty retreat, asserting without explanation that the *Delta* approach "would not flatly prohibit the reinstatement via arbitration of a speeding truck driver ..." (Dissent at 1223) The obvious question raised by this assertion is why truck drivers—whose reckless driving endangers the safety of all who drive the roads—can be reinstated, while mechanics—whose errant actions pose indistinguishable risks to those on the highways—cannot. Assuming that the dissent does not really intend to lay down an auto mechanic rule but a truck driver exception, it appears that it envisions something far beyond *Delta*, namely a system in which the courts, rather than the "non lawyer arbitrators" who cannot be trusted to "vindicate the public

interest in health and safety" (*see* Dissent at 1223), look to the "totality of facts and circumstances of the case" (p. 1223) and themselves determine whether reinstatement is appropriate or whether some form of punishment is warranted. The adoption of such a totality of the circumstances test would violate the teachings of *Misco*, the *Steelworkers Trilogy*, and the thirty years of cases in between, by making judges the arbitral factfinders, indeed, the masters of a process in which (as the Supreme Court has repeatedly emphasized over the past three decades) the judicial role must be a strictly limited one.

17. We note, however, that the relationship of any alleged miscreance to the employee's job is an important factor for the arbitrator to consider when assessing the propriety of the remedy.

auto mechanic] who h[as] previously [committed a reckless act]." 654 F.2d at 644. As we explained *supra* at 1215, we reject the approach of the Eleventh Circuit that, simply because an employee has committed some act which violates a law or a public policy in the course of his employment, his reinstatement would also necessarily violate that public policy. This argument is fallacious, reflecting precisely the analytical error in Stead Motors' argument here, for it is only if the grievant is likely to engage in wrongful conduct which violates public policy in the future that his reinstatement could be said to violate public policy. If we assume the existence of the public policy posited by the original panel's opinion, it may be true that Rocks' conduct ran afoul of it in the past. But we are not free to assume that Rocks would, if appropriately disciplined, run afoul of it in the future. As we have emphasized throughout, it is the function of the arbitrator, not the courts, to make assessments with respect to appropriate punishments and to determine the likelihood of rehabilitation—a judgment about whether the grievant will engage in future wrongdoing, *supra* at 1208–09, 1211, 1212–13. With respect to the award we consider here, we have already made clear that Arbitrator Le Prohn conclusively determined the issue of rehabilitation in Rocks' favor.

There are two possible alternative explanations for the result reached by the district court. Both are illegitimate. First, the district court might have concluded that the arbitrator's decision in favor of a 120 day suspension was insufficient, as a retributive matter, to punish a once-reckless employee sufficiently and that the general public policy it had ostensibly identified (but did not articulate, *supra* n. 5) could be served only through the ultimate employee sanction, termination. To the extent that this, or similar second-guessing, motivated the district court, we must reiterate, now for the final time, that if the court so acted it acted improperly.

Second, it is possible that the court felt that the arbitrator's belief that a suspension would teach Rocks a lesson was erroneous. Although from one perspective, one cannot quarrel with a judge who honestly believes that a reinstated employee may be reckless in the future, *Misco* explicitly advises that upsetting the arbitrator's award on this ground is impermissible, however laudable the judge's motivation. Courts are strictly barred from engaging in fact-finding when they review labor arbitration awards. Again to paraphrase, this time *Misco:*

> Had the arbitrator found that Rocks had been reckless in improperly tightening the lug bolts, yet imposed discipline short of discharge because he found as a factual matter that he could be trusted not to do so in the future, the Court of Appeals could not upset the award because of its own view that public policy about automobile safety was threatened.

108 S.Ct. at 374.

The parties did not bargain for a court's judgment. They bargained for an arbitrator to tell them what was "just cause" for discharge and what was not. In so doing, they chose a method of resolving their differences and definitively interpreting their bargain. Each side obtained certain advantages from the arrangement. Neither had the right to believe that it could refuse to honor an arbitrator's award simply because it was disappointed by or disagreed with the result in a particular case. We find that the arbitrator did everything the parties requested him to do; he did nothing more, and nothing he did was illegal or violated public policy. Our inquiry goes no further.

REVERSED and REMANDED with instructions to confirm the award.

TROTT, Circuit Judge, dissenting, in which dissent Circuit Judge NOONAN concurs:

Judge Reinhardt's scholarly opinion is impressive. It provides an excellent review of the law governing this case, as well as the policies at stake. But, in my respectful view, like a column of correct numbers added up improperly, the bottom line is wrong.

When I first read the opinion, I could not help but be reminded of an incident that occurred off the coast of Hawaii a year or so ago. Part of the skin blew off an Aloha Airliner in flight, exposing the crew and passengers to the possibility of a crash landing at sea and almost certain death. One person was sucked out of the fuselage and killed. Incredibly, the two pilots pulled off a miracle, landing the seriously crippled aircraft without further incident. The two pilots shortly thereafter were interviewed as heroes on one of the network morning television shows. As I watched them describe their brush with death, I was astounded by their cool and professional demeanor, as well as their amazing skill. But, as much as anything else, I will always remember the response of one of the pilots when asked at the end of the interview if she had any advice for airline passengers as a result of this experience. She smiled and said, "Just remember to keep your seat belts fastened."

The pilot's remark is not only good advice for airline passengers, but it is now good advice for customers of Stead Motors and for other motorists who drive on the same streets with them in Contra Costa County, California. Why? Because this court today reinstates *to the same position from which he was fired* an auto mechanic who has demonstrated without a doubt by his reckless and obstinate conduct that he has a propensity not to affix tightly wheels to the cars that depend on them for safe passage; and, to add insult to injury, he was ordered reinstated with partial back pay.

The facts and circumstances surrounding Gale Rocks' activities—for which he refused to accept responsibility—are described by the arbitrator in his Opinion and Award dated November 3, 1986 as follows:

On October 10, 1984, Grievant received a warning for "[failure] to use basic industry-wide safety procedures". The warning stated in pertinent part as follows:

... After installing the left rear tire, you failed to properly tighten the lug bolts which caused all but 2 of the bolts to fall off. The 2 remaining bolts came so loose that the wheel almost came off while this owner was driving at highway speeds in San Francisco.

Your gross negligence was brought to our attention after this owner returned to us so we could replace the missing lug bolts.

In September of 1985, Grievant was involved in an argument with Shop Foreman Alan Banks concerning the proper procedure for tightening the lug bolts when tires are put back on a vehicle. Following this dispute, Grievant was advised that the Shop Foreman had absolute authority to determine policy, that Grievant was not authorized to disregard instructions from the shop foreman, and that he was required to mount and "torque" the wheels as instructed.

The incident which precipitated the termination occurred on October 14, 1985. On that date, Grievant performed certain repair work, including the replacement of brake pads which required the removal of the front wheels, on a vehicle owned by customer Richard Diebert. The Employer's work order reflects that Grievant was the only employee who worked on the subject vehicle. He completed the work at about 1:00 p.m. and Diebert picked up the car and drove to his residence, a distance of about ten miles, at about 4:00 p.m.

Shortly thereafter, Diebert called Sheehan and reported that in the course of driving home he noted a "very heavy" vibration in the front end of the car. Sheehan immediately dispatched employee Joe Lyons to the Diebert home to inspect the vehicle. Lyons discovered that four lug bolts on the left front wheel were loose and the fifth was missing; in addition, three lug bolts were loose on the right front wheel. Lyons tightened all of the loose bolts and replaced the missing one. Shop foreman Brad Gibson subsequently inspected the car at the Employer's facility for possible damage to any parts but no damage was identified.

In the course of investigating this matter, Sheehan noted that it appeared from

the work order that Grievant was the only employee who worked on Diebert's vehicle and he discussed the matter with the employee. Grievant asserted that he could not "accept" that he was responsible for the problem. Sheehan made the decision to terminate Grievant and issued a letter dated October 15 which stated in pertinent part as follows:

On October 10, 1984 you were given a warning letter for this same reason, wheels being left loose.

Due to this latest occurrence, Stead Motors can no longer assume the liability for your actions. You were extremely remiss in performing your responsibilities which is tantamount to recklessness under Paragraph 5.02 of the present Union Contract. Your conduct not only compromised the reputation and liability of Stead Motors but also jeopardized the health and welfare and safety of Mr. Diebert. In accordance with this section we must exercise our option to terminate you for recklessness.

At hearing, Sheehan explained the basis of the termination penalty as follows: 1) Grievant experienced the same problem and received a warning a year previously; 2) Grievant had continual problems working with supervision (i.e. his attitude); and 3) Grievant's conduct was "reckless" as defined in Webster's Dictionary and the Employer had great liability exposure if such conduct was repeated and someone was injured.... Sheehan further testified that he gave "substantial" weight to the liability exposure factor.

In the "Discussion" section of his Opinion and Award, the arbitrator made these additional findings and observations:

However, when a person is made aware of the serious consequences of the mistake and nevertheless repeats it, the repeated behavior suggests an indifference to those consequences. Here, Grievant knew the requirements of this particular job function. He also knew of the potential danger to life and safety and the potential financial consequences

thereof to the Employer. In all of the circumstances disclosed in this record, Grievant's failure to tighten the lug bolts on October 14, 1985, constituted recklessness which warranted discipline pursuant to Section 5.02 of the Agreement.

. . . . .

In addition, at the arbitration hearing, Grievant was unduly argumentative and he attempted repeatedly to justify and excuse his conduct. His behavior did not assist his cause.

No wonder the district court refused to sanction this travesty. It would be one thing for the parties themselves to get together privately and agree on such an unpalatable result, but it is another altogether for a federal court to put its imprimatur on such a disaster.

Judge Reinhardt's opinion attempts unconvincingly to cast this matter as involving only the "reinstatement" of an errant employee. I decline to accept this crabbed and incomplete characterization of what is at stake in this case. We are confronted not just with a case of reinstatement, but with reinstatement of a demonstrably reckless and obstinate mechanic to a job that requires skill and care. When Mr. Rocks does not do his job properly, wheels on moving vehicles loosen enough to send them careening out of control, endangering life in the process. This explains California's prohibition against the unsafe operation of motor vehicles in its Vehicle Code: unsafe cars injure and kill.

I respectfully see the reinstatement of Gale Rocks to his old job as violating a clear and dominant public policy expressed in law and precedent by the State of California in favor of road-worthy automobiles and safety on the highways, and against dangerously reckless automotive maintenance and repair, especially by those in that business; and I view it thusly for two reasons.

First, I agree with Judge Noonan who wrote for the original panel in this case:

There exists in California a "well defined and dominant" public policy regarding automobile safety and maintenance.

California Vehicle Code § 24002 provides:

> It is unlawful to operate any vehicle or combination of vehicles which is in an unsafe condition....

There is, the Supreme Court of California has said, "express legislative recognition of the fact that improperly maintained motor vehicles threaten 'a grave risk of serious bodily harm or death.'" *Maloney v. Rath*, 69 Cal.2d 442, 448, 71 Cal. Rptr. 897, 900, 445 P.2d 513, 516 (1968) (Traynor, C.J.), quoting Restatement (Section) of Torts § 423.

To minimize the risk of improper maintenance, the legislature established the California Bureau of Automobile Repair in 1971. Cal.Bus. & Prof.Code § 9882. The Bureau is authorized to "inquire into the practice and policies of the automotive repair industries ... and make such recommendations with respect to such policies, practices and functions as may be deemed important and necessary by the Bureau for the welfare of the consuming public and the automobile repair industry." *Id.* at § 9882.13. The Bureau is further authorized to establish general motor vehicle repair standards, rules for the certification of repair facilities (including mechanics' qualifications), and an on-site inspection program to insure compliance with the standards of certification. *Id.* at § 9889.33, § 9889.39. The Bureau's rules and regulations are codified in Cal.Admin.Code, Title 16, §§ 3300, et. seq.

No one may be an automobile repair-dealer in California unless registered in accordance with law by the Bureau. *Id.* at § 9884.6. The Bureau may invalidate registration if it finds that the dealer or any employee of the dealer has been guilty of gross negligence. *Id.* § 9884.7. Stead Motors could not have kept Rocks and stayed in business. *Id.* § 9884.6.
843 F.2d at 359.

In *Maloney v. Rath*, the defendant was the driver of a car that caused a serious accident due to defective brakes. Because she neither knew nor had reason to know the brakes were defective until they failed, she attempted in court to avoid liability for the damage by shifting the blame to her mechanic who was responsible for the faulty installation of a hydraulic hose which ruptured. In refusing to release her from liability, Chief Justice Traynor described the law in California in very explicit terms. It is from this passage that Judge Noonan selected his exerpt:

> Section 423 of the Restatement Second of Torts provides that "one who carries on an activity which threatens a grave risk of serious bodily harm or death unless the instrumentalities used are carefully * * * maintained, and who employs an independent contractor to * * * maintain such instrumentalities, is subject to the same liability for physical harm caused by the negligence of the contractor in * * * maintaining such instrumentalities as though the employer had himself done the work of * * * maintenance." Section 424 provides that "One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions." Both of these sections point to a nondelegable duty in this case. *The statutory provisions regulating the maintenance and equipment of automobiles constitute express legislative recognition of the fact that improperly maintained motor vehicles threaten "a grave risk of serious bodily harm or death."* The responsibility for minimizing that risk or compensating for the failure to do so properly rests with the person who owns and operates the vehicle. He is the party primarily to be benefited by its use; he selects the contractor and is free to insist upon one who is financially responsible and to demand indemnity from him; the cost of his liability insurance that distributes the risk is properly attributable to his activities; *and the discharge of the duty to exercise reasonable care in the maintenance of his vehicle is of the utmost importance to the public.* (See

*Van Arsdale v. Hollinger*, supra, 68 A.C. 249, 257 [68 Cal.2d 245], 66 Cal. Rptr. 20, 437 P.2d 508 and authorities cited.)

In the present case it is undisputed that the accident was caused by a failure of defendant's brakes that resulted from her independent contractor's negligence in overhauling or in thereafter inspecting the brakes. Since her duty to maintain her brakes in compliance with the provisions of the Vehicle Code is nondelegable, the fact that the brake failure was the result of her independent contractor's negligence is no defense. (Emphasis added).

69 Cal.2d at 448, 71 Cal.Rptr. at 900–01, 445 P.2d at 516–17.

Not only does this answer the key questions in this case about California's policy, but it is also very bad news for customers of Stead Motors who will get Gale Rocks as a brake mechanic.

Second, I agree with the analysis of Judge Hill in *Delta Air Lines, Inc. v. Air Line Pilots Assn. Int'l.*, 861 F.2d 665 (11th Cir.1988), *reh'g denied*, 867 F.2d 1431 (11th Cir.1989):

As noted above, *Misco* requires the finding of a well defined public policy and an award that conflicts with that policy. The public policy of which the Supreme Court speaks in *Misco* seems to be a public policy not addressing the disfavored conduct, in the abstract, but disfavored conduct which is *integral to the performance of employment duties*. The question we are instructed, by *Misco*, to ask is not, "Is there a public policy against the employee's conduct?", but, rather, "Does an established public policy condemn the performance of employment activities in the manner engaged in by the employee?" Such a policy does exist in this case; the arbitrator's finding of no just cause explicitly conflicts with that policy.

*Id.* at 671.

. . . . .

Where the person performs his employment duties and, *in doing so*, violates standards, restraints and restrictions on conduct, clearly and explicitly established by the people in their laws, a requirement that the employer suffer that malperformance and not discharge the offender does itself violate the same well established public policy.

*Id.* at 674.

It is disheartening to see this court turn its back on *Delta* and *Iowa Elec. Light & Power Co. v. Local Union 204 of the Int'l Bhd. of Elec. Workers*, 834 F.2d 1424 (8th Cir.1987). This repudiation illustrates how narrowly this circuit now views the public policy exception reaffirmed by the Supreme Court in *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). I use the term "narrowly" advisedly because it would appear that the result in this case chokes the "public policy" exception—*hic sepultus*—into oblivion. If it survives this case, it survives in name only.

A review of the facts in *Delta* is enlightening. In that case, the Pilot-in-Command flew while drunk a commercial airliner filled with passengers on a scheduled flight, and he flew it personally from take-off to landing. His misconduct was discovered, and he was understandably discharged five days later. The pilot grieved unsuccessfully his discharge. The Air Line Pilots Association, asserting that "[the pilot's] flying ... while drunk was not a sufficient cause for discharge, submitted the dispute to the System Board," *id.* at 668, which ruled 3–2 that he should be reinstated. As in the case at hand, the district court overturned the arbitrator's decision as violative of public policy, and the Eleventh Circuit Court of Appeals affirmed. Make no mistake about it: in this circuit the federal courts would most probably have seen to it that Delta Airlines would have been forced to permit the pilot to return to the cockpit of another Delta airliner.

The application of Judge Reinhardt's approach in this case to the facts of *Iowa Electric* yields an equally troublesome result. In that case, a nuclear power plant employee—in a hurry to leave the area to go to lunch—ordered a foreman to discon-

**1222**

nect a safety device on a doorway designed to protect the public from harmful radiation. After being terminated for this misconduct, he, like the pilot in *Delta,* was ordered reinstated by an arbitrator. The district court, however, overturned the arbitrator's order as incompatible with public safety concerns, and the Eighth Circuit Court of Appeals affirmed. In this circuit that employee most likely would have been ordered back to work, same job, same nuclear facility.

Judge Reinhardt's opinion brushes off *Delta* and *Iowa Electric* as "thought provoking." If those cases would have arisen in this circuit, the results might have been nothing less than hair-raising. The results will be hair-raising when similar cases do arise in this circuit and are governed by today's opinion. The bromidic observation of the court that all of us suffer when potentially productive workers are relegated to unemployment is scarcely a response to the threat to public safety embodied in the majority opinion.

Accidents happen in the blink of an eye. Danger appears out of nowhere, sinking ships, downing planes, and sending cars out of control. Our best defense to these inescapable perils of life is not air bags and seat belts, but attentive, trustworthy human beings, such as the pilots of the Aloha Airliner and the millions like them who take pride in jobs well done. I do not believe that deference to arbitration, a concept with which I wholeheartedly agree, suffers at all if the judiciary retains the right to keep arbitrators within the bounds of public policy; nor do I think that *Misco* compels the excessively "hands-off" policy adopted today in this circuit.

*Misco*'s main defect was that the Court of Appeals improperly based its views of public policy on "general considerations of supposed public interests," not "laws and legal precedents" as required by *W.R. Grace. Misco,* 108 S.Ct. at 373–74. This mistake was not made by Judge Noonan and the three-judge panel. Judge Rein-

hardt's opinion takes the view here, however, that the material relied on by the panel is insufficient to form an explicit, well-defined, public policy. With respect, I find this view unpersuasive. It ignores the clear meaning of the written word, and it slights the unmistakable purpose of California's laws, suggesting that only a precise violation of a positive law caused by the award itself would suffice to meet the Supreme Court's test—a question left undecided in *Misco. Id.* 108 S.Ct. at 374 n. 12.[1] It is difficult to read Judge Reinhardt's opinion, however, without coming to the conclusion that we have now answered this question in this circuit, without expressly saying so; and that we have closed our door's permanently to complaints that an arbitrator's award violates "public policy" unless the award itself clearly violates a statutory prohibition. The approach to this case and the treatment of *Delta* and *Iowa Electric* are tantamount to such a holding. Although Judge Reinhardt's opinion seems to hold out some hope that another way could be found to reach the same result in those cases, I respectfully believe that these dicta amount to an illusion.

What Judge Reinhardt's opinion does today in reinstating Gale Rocks and rejecting the rationale of *Delta* and *Iowa Electric* provides sufficient reason to question seriously the utility of a restrictive positive law test. A somewhat broader more rational approach grounded on analysis and informed judgment—confined by "law and precedent"—makes more sense in that it gives life to the public policy exception rather than suffocating it beyond resuscitation. The results in *Delta* and *Iowa Electric* do not trench inappropriately upon the federal policy of settling labor disputes by arbitration, nor would the termination of Gale Rocks. To borrow from *Iowa Electric,* " 'He is no longer to be trusted to work in such a critical environment when he shows no respect for the safety implica-

---

1. In *Misco,* The Supreme Court took some comfort in the provision of the award that permitted the worker's reinstatement to a different equivalent job, stating that it was not "clear ... that

[he] would pose a serious threat [to safety] in every job for which he was qualified." 108 S.Ct. at 374. There is no room for such comfort here: Mr. Rocks gets his old job back.

tions of his actions and when he is willing to jeopardize the safety of the public...'" 834 F.2d at 1429 (citation omitted).

The approach adopted by *Delta* and *Iowa Electric* would not flatly prohibit the reinstatement via arbitration of a speeding truck driver or a petty thief. To suppose that they do is an error that again follows from the trap of narrowly casting this issue only as one of reinstatement. All a broader approach does is to insure that the federal courts would not find their hands tied by the magic word "reinstatement" uttered by an arbitrator if such a reinstatement, based on the totality of facts and circumstances of the case, would violate an explicit, well defined, and dominant public health and safety policy of a state or the federal government.

I am not moved by the suggestion that the life of a single driver or the lives of a family in a passenger car are somehow less significant than the lives of airplane passengers or the people who live in the vicinity of a nuclear facility. One life is as precious as many, and I do not believe that public policy demands otherwise. Certainly, airplane crashes and nuclear power plant disasters command more attention by the media than a single fatal automobile collision, but that should not define the reach of federal law. Moreover, it is common knowledge that more automobile passengers die per year than airline passengers or neighbors of nuclear power plants combined; and a single out-of-control passenger car can kill an entire busload of school children.

This is not a minor problem that occurs only infrequently. Arbitration in these kinds of cases is very common, and as I have tried to show, the results are not always comforting. To take one example from another area, that of medical care, and use an actual case, Nurse S. put medicine not intended for the patient on his over-bed table. The patient took it while the nurse's back was turned. When she discovered the medicine was gone she told him "I don't know if it is going to hurt you but we'll keep an eye on you." She told no one about the mistake. When she came back from lunch, she found the patient had serious breathing problems. The supervisor tried to find out what medication the patient would normally be taking and asked Nurse S. directly what medication she had given him. Nurse S. claimed at the arbitration hearing "that in the excitement of the medical emergency she had forgotten about the medication error."

Less than an hour later the patient was in respiratory arrest with convulsions and had stopped breathing. A half dozen persons worked to resuscitate him including Nurse S. At no point did she report the medication she had let him have. Only the next day, when the patient had revived, did she respond to a question from a doctor who had obtained the information about the medicine from the patient himself. The hospital concluded that "it would not be safe to keep her [Nurse S.] in the environment." She was discharged.

The arbitrator found this "an extremely difficult case." He went on to say that Nurse S. "committed an appalling error in patient care." The arbitrator also observed that Nurse S. should "be seriously faulted for failing to formally report the incident" and that there was a serious question as to whether the failure "was inadvertent or deliberate." There was no doubt this failure was "a serious breach of patient care." She had also made a serious error in going to lunch before the other nurse had returned to her floor. The arbitrator concluded that there was no just cause for discharge. *In re Ohio Valley Hospital Association,* 79 L.A. 929 (1982). His decision would be final now in this circuit. There might be just cause for the elderly and infirm to worry about the kind of nursing care they would get where federal courts approve such reinstatement.

Or, what do we do with Warren Watson, the power company employee in Georgia responsible for reading gauges and meters designed to prevent the overheating of high pressure equipment? When he failed badly a drug test and was discovered to be a heavy chronic drug user, he was fired as a safety risk. But an accommodating arbitrator ordered his reinstatement *to his for-*

*mer position.* Shades of Gail Rocks. Fortunately for his co-workers, the federal district court balked at this order, remarking that, among other things, it could subject Watson's employer to liability for damages caused by Watson's future drug use. *Georgia Power Co. v. IBEW, Local 84,* 707 F.Supp. 531 (N.D.Ga.1989).

I suppose a lab technician, either intoxicated or in a hurry to get to lunch, who recklessly introduced AIDS-contaminated blood into our supply of blood maintained for purposes of medical transfusion would also be beyond the reach of the law in this circuit if a non-lawyer arbitrator, beholden to no one other than the parties to the contract in question, decided to cut the baby in half and put the offender back to work. The same is true of other unrepresentative workers in our labor force, such as the occasional inebriated engineer of a train, the deliberately indifferent pilot of an ocean-going tanker that goes around and spills millions of gallons of crude oil into our oceans and inland waterways, and the law enforcement officer who exceeds his authority and beats and abuses a prisoner. If an arbitrator uses the word "reinstatement," the federal courts in this circuit are now next to helpless to do anything about it. A new form of kryptonite has been invented that renders us impotent to vindicate the public interest in health and safety. What amounts to a general policy favoring reinstatement—which is committed entirely to arbitrators—now trumps the public policy exception and ousts us of our jurisdiction to keep the players on the appropriate playing field.[2] Although the analogy is far from perfect, it strikes me as curious that the pumping in a hospital by a doctor of the stomach of a drug dealer suspected of swallowing narcotics shocks the conscience of the federal courts,[3] yet we are serenely sanguine about our complicity in putting a dangerous pilot back into the cockpit of a commercial airliner, a reckless worker back into a nuclear

facility, and in returning Mr. Rocks to his responsibility for safely attaching wheels to passenger vehicles.

I would affirm the district court.

WALLACE, Circuit Judge, joined by Circuit Judges ALARCON and O'SCANNLAIN, and joined by Chief Judge GOODWIN in part I only, concurring in part and dissenting in part:

I agree with the plurality's conclusion that we must reverse the district court's order, which partially vacated the arbitral award. As the plurality demonstrates, Stead Motors has failed to meet the first threshold requirement identified in *United Paperworkers International Union, AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) (*Misco* ). *See* plurality op. at 1216. Stead Motors has not demonstrated the existence of a well defined, dominant, and explicit public policy in California, sufficiently grounded in "laws and legal precedents" rather than in "general considerations of supposed public interests," with which this arbitral award could conflict. *Misco,* 108 S.Ct. at 373–74. To decide this case, we need go no further. I write separately because the plurality reaches out to cover ground that is neither necessary nor desirable.

I

The Supreme Court first explicitly recognized the "public policy" exception to enforcement of labor arbitration awards in *W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) (*W.R. Grace* ). After declaring that "the question of public policy is ultimately one for resolution by the courts," the Court stated that if the collective bargaining agreement as interpreted by the arbitrator in his arbitral award "violates some explicit public policy, we are obliged to refrain from enforcing it." *Id.* at 766, 103 S.Ct. at

**2.** *Misco* counsels against reliance on "general considerations of supposed public interests." 108 S.Ct. at 373. Does this not describe the majority's description and use of "reinstatement"?

**3.** *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1951).

2183. (citations omitted). However, the Court cautioned that "[s]uch a public policy ... must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Id.*, *quoting Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945).

More recently, the Court in *Misco* articulated two "threshold" requirements which must be met before a court may refuse to enforce an arbitrator's award on public policy grounds: "At the very least, an alleged public policy must be properly framed under the approach set out in *W.R. Grace*, *and* the violation of such a policy must be clearly shown if an award is not to be enforced." *Misco*, 108 S.Ct. at 373–74 (emphasis added). The first threshold requirement—proper "framing" of the public policy under *W.R. Grace*—itself has two components: (1) the purported policy must be well defined, dominant and explicit, and (2) the policy must be grounded in "laws and legal precedents" rather than in "general considerations of supposed public interests." *W.R. Grace*, 461 U.S. at 766, 103 S.Ct. at 2183.

I conclude, with the plurality, that because Stead Motors's formulation of the public policy at stake fails to meet *Misco*'s first threshold requirement, we must reverse. The original panel accepted Stead Motors's invocation of California's alleged "strong public policy favoring the proper maintenance and repair of motor vehicles." Applying the first threshold requirement under *Misco*, the plurality holds that "[w]e have found nothing in the record of this case, in the arguments of counsel, or in our inquiry into the 'laws and legal precedents' of California which supports the existence of the specific public policy necessary to justify vacating the arbitral award in this case." Plurality op. at 1216. The plurality reasons that the two sections of the California Code identified by Stead Motors do not "constitute the sort of laws and legal precedents necessary for the valid expression of an 'explicit, well defined and dominant' public policy." *Id.* In other words, such

a policy cannot be "gleaned from [the] two sections of the California Code" cited by Stead Motors. *Id.* at 1204; *see also id.* at 1216. As the party seeking to have the award vacated, Stead Motors bears the burden of demonstrating, at the outset, the existence of a well defined, dominant and explicit public policy which is sufficiently rooted in laws and legal precedents rather than in general considerations of supposed public interests. I agree with the plurality that Stead Motors has not carried this burden. This should end the case.

## II

Unfortunately, the plurality is not content to stop on the first step of *Misco*'s threshold. Instead, it goes off on two *additional* grounds: (1) Stead Motors has not "clearly shown" that Rocks's reinstatement would violate Stead Motors's improperly framed public policy, and (2) at any rate the arbitrator's factual determination (judged according to a newly created rule of construction) of Rocks's amenability to discipline cannot be second-guessed by the court. In my view, we need not and should not reach these issues to decide the case. Reaching the last ground is especially unfortunate because the plurality's analysis of how courts should review an arbitrator's "finding" regarding a discharged worker's amenability to discipline is wrong.

The plurality constructs a formidable rule of deference to an arbitrator's "determinations" regarding discharged workers' amenability to discipline. It accomplishes this in three steps. First, it distills from the concluding paragraph of the majority opinion in *Misco* the principle that an arbitrator's "factual findings" regarding amenability to discipline are immune from judicial review. *See* plurality op. at 1212–13. Second, it formulates a potent rule of construction: arbitrators need not make an express finding that a discharged worker is amenable to discipline. *See id.* at 1213. In fact, according to the plurality, if an arbitral award which orders reinstatement *is silent* regarding amenability to discipline, "[a] court cannot infer ... that the arbitrator did not consider the question; nor can it

make an independent judgment in such a case." *Id.* at 1213. Instead, the court cannot "infer the non-existence of a particular reason merely from the award's silence on a given issue." *Id.* In other words, unless the arbitrator expressly says that he is *not* making a determination of amenability to discipline (and what arbitrator would do so if the plurality opinion were the law?), the courts must presume that such a determination was made. Third and finally, the plurality concludes: "Ordinarily, a court would be hard-pressed to find a public policy barring reinstatement in a case in which an arbitrator has, expressly or by implication, determined that the employee is subject to rehabilitation and therefore not likely to commit an act which violates public policy in the future." *Id.* at 1212. This analysis is wrong for several reasons.

The concluding paragraph of the majority opinion in *Misco* provides weak support for the plurality's amenability to discipline analysis. To begin with, the paragraph is composed of several "even if" arguments which are not necessary to the Court's decision. *See* 108 S.Ct. at 374. Not only is the paragraph dicta, but its primary focus is on a factual inference different in nature from that seized on by the plurality: the inference that because Cooper, the discharged worker, *possessed* drugs on company property, he was likely to *use* drugs before operating dangerous machinery. Here is the full paragraph:

> In any event, it was inappropriate for the Court of Appeals itself to draw the necessary inference. To conclude from the fact that marijuana had been found in Cooper's car that Cooper *had ever been* or *would be* under the influence of marijuana while he was on the job and operating dangerous machinery is an exercise in factfinding about Cooper's *use of drugs* and *his amenability to discipline*, a task that exceeds the authority of a court asked to overturn an arbitration award. The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them who had more opportunity to observe Cooper and to be familiar with the plant and its problems. Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task. If additional facts were to be found, the arbitrator should find them in the course of any further effort the Company might have made to discharge Cooper for having had marijuana in his car on company premises. Had the arbitrator found that Cooper had possessed drugs on the property, yet imposed discipline short of discharge because he found as a factual matter that Cooper could be trusted not to use them on the job, the Court of Appeals could not upset the award because of its own view that public policy about plant safety was threatened. In this connection it should also be noted that the award ordered Cooper to be reinstated in his old job or in an equivalent one for which he was qualified. It is by no means clear from the record that Cooper would pose a serious threat to the asserted public policy in every job for which he was qualified.

108 S.Ct. at 374 (footnotes omitted) (emphasis added).

The type of factual inference involved in *Misco* was different from the one before us. In *Misco,* the Court was focusing on the court of appeals's factual finding or inference that because Cooper *possessed* drugs, he would necessarily *use* them before operating dangerous machinery. Cooper had been found to possess drugs on company property. There was no finding that he had ever used drugs or operated machinery while under the influence of drugs. Nor was there a finding by the arbitrator that Cooper was likely or unlikely in the future to use drugs or to operate dangerous machinery while under their influence. At best, the amenability to discipline point was only a small part of the larger factual inference discussed by the Court in this paragraph. *Misco*'s final paragraph, composed of dicta and focused on a different kind of factual inference, provides extremely weak support for the plurality's expansive approach.

Moreover, there is an inconsistency between *Misco*'s concluding paragraph and

the plurality's approach. The Court in *Misco* disapproved of the court of appeals having drawn factual inferences or made factual findings not made by the arbitrator. The Court observed that "[i]f additional facts were to be found, the *arbitrator* should find them...." *Id.* (emphasis added). By reading silence as reflecting a finding of amenability to discipline, the plurality accomplishes through a rule of construction what the dicta in *Misco* forbids.

Contrary to its assertion, the plurality opinion does not merely embody a straightforward and noncontroversial application of the general principles for construing arbitral awards announced in the *Steelworkers Trilogy. See* plurality op. at 1207–1209, 1213: To begin with, the rules announced in *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), are not applicable to cases involving the public policy exception. If, as *Misco* establishes, " 'the question of public policy is ultimately one for resolution by the courts,' " 108 S.Ct. at 373, *quoting W.R. Grace*, 461 U.S. at 766, 103 S.Ct. at 2183, then the public policy exception is just that: an exception to *Enterprise Wheel* 's deferential rules for reviewing arbitral awards. Several of our past decisions have so held. *Sheet Metal Workers International Association, Local No. 359 v. Arizona Mechanical & Stainless, Inc.*, 863 F.2d 647, 653 (9th Cir. 1988) (after summarizing deferential *Enterprise Wheel* principles, stating that "[o]nly when the arbitrator's award actually violates the law or any explicit, well-defined and dominant public policy, is deference inappropriate."); *George Day Construction Co. v. United Brotherhood of Carpenters & Joiners of America, Local 354*, 722 F.2d 1471, 1477 (9th Cir.1984) (same). *Enterprise Wheel* did not involve the public policy exception; it involved whether a labor arbitrator had exceeded the scope of his power under the collective bargaining agreement. This is a question of *contractual interpretation* made, in the first instance, by the arbitrator. Thus, the Court in *Enterprise Wheel* was being asked to substitute its judgment for the arbitrator's on an issue on which the parties had bargained for the arbitrator's judgment: the meaning of the contract.

By contrast, in deciding whether to vacate an arbitral award because it conflicts with public policy, a court "is actually concerned with the *lawfulness of its enforcing* the award and not with the *correctness of the arbitrator's* decision." *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America Local 985 v. W.M. Chace Co.*, 262 F.Supp. 114, 117 (E.D.Mich.1966) (emphasis in original); *see also Misco*, 108 S.Ct. at 373 (public policy exception "derives from the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act."). Because a court, in considering whether to vacate an award for public policy reasons, is not reconsidering a decision already made by the arbitrator—that is, is not substituting its judgment for the arbitrator's on an issue on which the parties bargained for the arbitrator's judgment—the *Enterprise Wheel* principles do not apply.

In addition, I fail to see how we can square the plurality's rule of construction with *Misco* 's teaching that " 'the question of public policy is ultimately one for resolution by the courts.' " 108 S.Ct. at 373, *quoting W.R. Grace*, 461 U.S. at 766, 103 S.Ct. at 2183. I believe that the plurality's rule of construction relegates, under certain circumstances, the question of public policy to the arbitrator. If the asserted policy is one potentially threatened by the worker's future conduct, the plurality's rule would confer upon the arbitrator the unreviewable power to determine in effect whether the reinstatement violates public policy. I am concerned about the mischief this rule would create where a party demonstrated the existence of a well defined, dominant and explicit public policy which clearly conflicted with the arbitral award, yet the arbitrator found the worker amenable to discipline.

The plurality's "amenability to discipline" discussion is unnecessary to our decision, unwise, unwarranted by the final paragraph in *Misco,* and wrong. Since there already exists another reason to reverse, we need not and should not address this problematic one as well.

### III

Lastly, I am troubled by the plurality's extended discussion of hypothetical grounds on which *Delta Air Lines, Inc. v. Air Line Pilots Association, International,* 861 F.2d 665 (11th Cir.1988), and *Iowa Electric Light & Power Co. v. Local Union 204,* 834 F.2d 1424 (8th Cir.1987), "could have" been decided, and its explanation of why these invented rationales would not change the outcome of this case. *See* plurality op. at 1214–16. This discussion is unnecessary since our primary, stated reason for not following these two cases is that they misread *Misco.* Both cases erroneously focus on whether public policy conflicts with the discharged worker's *past conduct* instead of with the *arbitral award. See id.* at 1215–16. In addition, in both cases *Misco's* first threshold requirement is met—here it is not. At any rate, since the plurality opinion itself acknowledges that its extraneous remarks on *Delta* and *Iowa Electric* are dicta, *see id.* at 1215 n. 15. I need not formally dissent from this discussion.