[No. B044563. Second Dist., Div. Four. Aug. 20, 1990.]

SCREEN ACTORS GUILD, Plaintiff and Respondent, v.
A. SHANE COMPANY, Defendant and Appellant.

Loeb & Loeb, Richard W. Kopenhefer, Ivy Berg Kagan and Stacy F. Grumet for Defendant and Appellant.

Taylor, Roth, Bush & Geffner, Leo Geffner, Jesus E. Quinonez and Joseph A. Kohanski for Plaintiff and Respondent.

## OPINION

**GOERTZEN, J.**—Defendant/appellant A. Shane Company (appellant) appeals from the judgment confirming arbitration awards, which ordered appellant to pay salary and pension and health benefits to Todd Allen, a member of the Screen Actors Guild (SAG), respondent herein. SAG requests that we award it attorney fees, pursuant to Labor Code section 1128, subdivision (b).

### FACTS

A pilot for a television series, "High Mountain Rangers," was shot and included Todd Allen as an actor. Appellant was the producer of the series and entered into a series option agreement with Mr. Allen, incorporating relevant SAG basic agreements of 1986. Exercise of the option was dependent on the sale of the series to a major television network. During the

summer of 1987, appellant and Mr. Allen participated in a variety of pre-production activities in the hope of the series being picked up. Included in these activities were two wardrobe fittings.

Subsequently, the details of the production were fully negotiated with the network. Appellant's representative called Mr. Allen's agent and notified her of the amount of relocation fee being offered. She was unhappy with the amount and believed it to be below SAG minimums. Appellant took the position that failure to accept the relocation fee was a rejection of the agreement. It was later determined that the relocation fee was within SAG guidelines; nonetheless, appellant decided not to proceed with Mr. Allen's employment.

Mr. Allen hoped to meet with Robert Conrad, the star of the series. Mr. Allen believed Mr. Conrad had influenced appellant's decision not to employ him. Mr. Allen's brother was employed by appellant to take its production office, housed in a trailer, to the production site in the Lake Tahoe area. Despite instructions from appellant to the contrary, Mr. Allen accompanied his brother to Lake Tahoe, where Mr. Conrad was located. On their way from Los Angeles, Mr. Allen and his brother "had a bizarre, unpleasant and probably drunken conversation with Joan Conrad," president of appellant company and daughter of Robert Conrad. Mr. Allen and Robert Conrad did meet in Lake Tahoe, and it was confirmed that Mr. Allen would not be part of the series.

### PROCEDURAL HISTORY

On behalf of Mr. Allen, SAG filed a statement of claim and demand for arbitration, seeking to hold appellant liable to compensate Mr. Allen pursuant to his series employment agreement. Appellant countered that the option had never been exercised, and that even if Mr. Allen had been employed, his or his agent's actions constituted anticipatory breach or grounds for default under the employment contract.

As required, the matter was submitted to arbitration, and the parties stipulated that the arbitrator could frame the issues. The arbitrator identified the issues as follows: "1. Did [appellant] definitely engage Todd Allen for the first Contract Year of the television series entitled 'High Mountain Rangers?' [¶] 2. If so, pursuant to which provisions was he discharged? [¶] 3. What, if any, payments are due to Todd Allen from [appellant]?"

Interpreting various provisions of four different applicable contracts, the arbitrator found that Mr. Allen's option was exercised when he participated in the wardrobe fittings and that the objectionable behavior upon which

appellant based its discharge of Mr. Allen (the unauthorized drive to Lake Tahoe and the "unfortunate" telephone conversations with Ms. Conrad) were not within the meaning of default as defined by the employment agreements.[1] The arbitrator found in SAG's favor and ordered appellant to pay Mr. Allen his salary for one contract year in the amount of $48,000 and to contribute $5,280 in pension and health benefits.

On January 26, 1989, SAG filed its petition for confirmation of arbitration award with the superior court. On February 14, 1989, appellant filed its cross-petition to vacate arbitration awards, arguing that the arbitrator had exceeded her authority under the various agreements by amending or ignoring the express language of the agreements and that the arbitration awards violated public policy.

After hearing argument on the matter and taking it under submission, on May 12, 1989, the court confirmed the arbitrator's award.[2] The judgment was executed on July 20, 1989, and this appeal timely followed.

## STANDARD OF REVIEW

In our review of arbitration awards rendered pursuant to collective bargaining agreements, we are required to apply federal substantive law. (*Greenfield* v. *Mosley* (1988) 201 Cal.App.3d 735, 742 [247 Cal.Rptr. 314].) We are bound to enforce an arbitration award and are not entitled to review the merits of the contract dispute unless the decision does not "draw its essence from the collective bargaining agreement." (*Steelworkers* v. *Enterprise Corp.* (1960) 363 U.S. 593, 597 [4 L.Ed.2d 1424, 1428, 80 S.Ct. 1358].) As long as the arbitrator's decision has some basis in the collective

---

[1] The arbitrator did not discuss appellant's contention that if there were a contract, Mr. Allen's agent anticipatorily breached it when she expressed disagreement with the amount of the relocation fee.

[2] The court offered the following rationale for its ruling: "The arbitrator's interpretation of the 'except as otherwise expressly provided' language in Section 7(f) of the SAG TV agreement is not beyond the scope of the arbitrator's authority to interpret the meaning and effect of the collective bargaining agreement in light of the industry involved and the purposes of collective bargaining. While it might be argued that the consequent result is an anomaly not intended by the negotiators of the collective bargaining agreement, it is a result grounded in the ultimate language contained in the agreement. Once the arbitrator's interpretation of the 'except as otherwise expressly provided' clause is accepted, there is a textual basis for concluding that the Schedule C engagement provisions apply to 'series contracts' as a consequence of Section 7 and 7(f). While application of such engagement provisions to series performers might not be sensible in view of the imperatives of the industry, that is a matter for resolution through the collective bargaining and arbitration process so long as the arbitrator's decision flows from the words placed in the agreement. Although the language of Section 71 provides reason to doubt the correctness of the arbitrator's interpretation of Section 7 and 7(f), that alone is not a basis to vacate the award. The arbitration award is therefore confirmed."

bargaining agreement, "the courts have no business overruling [the arbitrator] because their interpretation of the contract is different from [the arbitrator's.]" (*Id.*, at p. 599 [4 L.Ed.2d at p. 1429].) "[I]f, on its face, the award represents a plausible interpretation of the contract in the context of the parties' conduct, judicial inquiry ceases and the award must be affirmed. [Citations.]" (*Holly Sugar Corp.* v. *Distillery, Rectifying, Wine & A.W.I.U.* (9th Cir. 1969) 412 F.2d 899, 903.)

DISCUSSION

I. *Applicable Agreement Provisions.*

We begin with an explanation of the four contracts which govern this dispute. The Screen Actors Guild Codified Basic Agreement of 1986 (Basic Agreement) is a collective bargaining agreement between SAG and the producers which governs actors' terms and conditions of employment in the entertainment industry in general. The 1986 Screen Actors Guild Television Agreement (TV Agreement) supplements the Basic Agreement and specifically governs actors' terms and conditions of employment in television. In addition to these general contracts, appellant and Mr. Allen were parties to two separate employment agreements: a series option agreement (Series Option Agreement), which gave appellant the option to employ Mr. Allen in the series; and a series employment agreement (Series Employment Agreement), which would govern Mr. Allen's employment were appellant to exercise the option to employ him.

*Pertinent provisions of the Basic Agreement.* Section 11, subdivision (b), provides that applicable provisions of the Basic Agreement and the provisions contained in the appropriate schedules "shall be deemed incorporated in the individual contract of employment" between producers and performers. Section 11, subdivision (c), provides that no waiver by any performer of any term of the Basic Agreement shall be requested or effective unless the consent of SAG is first obtained. Section 37 discusses termination procedures and provides that a producer may terminate a performer either prior to commencement or during the course of production; however, if the producer terminates prior to the commencement of the term, the producer shall pay the performer during the minimum guaranteed term provided for in the employment contract. Schedule C, section 6, subdivision (B), discusses the execution of agreement of a freelance performer and, in pertinent part, provides: "B. A freelance performer under this Schedule C shall be considered definitely engaged in any of the following events: . . . [¶] (4) When a performer is fitted for work. . . ."

*Pertinent provisions of the TV Agreement.* Section 8, subdivision (h), provides that the provisions of section 7, subdivision (f) apply to one-hour

programs with less than 13 episodes, like the one here at issue. Section 7, subdivision (f), provides that: "Except as otherwise expressly provided, all terms and conditions of Schedule B or C, H or I [of the Basic Agreement], whichever shall be applicable, shall govern" employment in one-hour programs with thirteen episodes guaranteed. Section 71, entitled "Engagement of Freelance Performers—Not Including Series Performers," provides that a freelance performer under Schedule C shall be considered definitely engaged, among other circumstances, "(d) when a performer is fitted for work. . . ."

*Pertinent provisions of the Series Option Agreement.* Section 6, subdivision (a), provides that if any conflict between it and the SAG agreements exists, it "shall be deemed modified to the minimum extent necessary to eliminate the conflict."

*Pertinent provisions of the Series Employment Agreement.* Section 5 provides that a player is guaranteed compensation for all pictures produced during the contract year. Section 17, subdivision (a) provides that a producer may suspend running of the contract time during occurrence and continuance of a default of the performer. Section 17, subdivision (a)(i) defines a default as: "Player commits a material breach of this agreement, or either Player or Player's agent indicates that Player intends to do so or Player fails to give written affirmation of Player's intention fully to perform hereunder within 24 hours after receipt of Producer's request that Player so affirm." Section 17, subdivision (c) permits the producer to terminate upon occurrence of a default.

II. *Issues on Appeal.*

Appellant asserts that the plain language of section 71 of the TV Agreement renders the arbitrator's decision invalid. As noted, section 71 allows a freelance performer, *not* including a series performer, to be considered definitely hired when fitted for work. Appellant objects to the arbitrator ignoring the language excluding a series performer from this provision and contends that in so doing she exceeded the authority granted her by the agreements.[3] Appellant further contends that the Series Option Agreement requires the exercise of the option to be in writing; and the arbitrator's failure to rule on its anticipatory breach argument requires vacation of the award.

 SAG counters that since sections 8 and 7, subdivision (f), of the TV Agreement state that "except as otherwise expressly provided" applicable

---

[3] Both the Basic Agreement and the TV Agreement provide for arbitration of disputes and limit the arbitrator's authority by providing that he or she has no power or authority to reform any contract involved in the arbitration.

provisions of schedule C shall apply and schedule C (of the Basic Agreement), section 6, subdivision (B)(4) allows a freelance performer to be considered definitely engaged when fitted for work, the arbitrator's opinion and award are drawn from the essence of the agreements and cannot be disturbed.

■ As noted, on review of an arbitration award made pursuant to contracts written through the collective bargaining process, we must affirm if the arbitrator's interpretation of the contracts is plausible. This is true "even if the basis for the decision is ambiguous." (*George Day Const.* v. *United Broth. of Carpenters* (9th Cir. 1984) 722 F.2d 1471, 1477.)

■ We conclude that the arbitrator's interpretation of the various contract terms is plausible. Section 71 of the TV Agreement does, indeed, exclude series performers from its description of the various ways engagement of a freelance performer may occur; and it is true that Mr. Allen is a series performer. However, it is plausible that the reason for section 71's exclusion of the series performer is that the TV Agreement earlier provides that the engagement of the series performer is already covered by the provisions of schedule C of the Basic Agreement. Sections 8 and 7, subdivision (f), apply to freelance performers who are series performers in one-hour programs with thirteen episodes guaranteed. Section 7, subdivision (f), provides that the engagement of these particular series performers (like Mr. Allen) is governed by the provisions of schedule C, which, in turn, allows for engagement by wardrobe fitting. In short, the arbitrator did draw the award from the essence of the agreements. Faced with a seeming contradiction, she carefully studied the various pertinent provisions and, acting within the scope of her authority, fashioned an appropriate award.

■ Appellant also contends that it never exercised the option to employ Mr. Alien because the Series Option Agreement requires that the option be exercised only in writing. In pertinent part, section 1 of the Series Option Agreement provides that: "The Series Option may be exercised by written notice from Producer to Player given not later than a date twelve (12) months after the date of completion of principal photography of the Pilot." We reject this argument because the language of this section is not mandatory but permissive. Moreover, the arbitrator's authority to interpret this clause, in light of the engagement provisions of the Basic and TV Agreements, is clear under section 11B of the Basic Agreement (incorporation in individual contract between performers and producers) and section 6, subdivision (a) of the Series Option Agreement (conformity with SAG agreements).

Appellant asserts that vacation of the award is required because the arbitrator failed to address the "central" issue of the anticipatory breach.

This assertion is unavailing for two reasons. First, the arbitrator did resolve the issue to which anticipatory breach was offered as a defense—the proper contractual provision governing the terms of Mr. Allen's discharge. ■ "[W]e do not infer the non-existence of a particular reason merely from the award's silence on a given issue. Indeed, the Supreme Court has determined that a court cannot set aside an arbitrator's award which, far from merely being silent, was affirmatively ambiguous, . . ." (*Stead Motors* v. *Automotive Machinists Lodge 1173* (9th Cir. 1989) 886 F.2d 1200, 1213, cert. denied __ U.S. __ [109 L.Ed.2d 531, 1110 S.Ct. 2205].) Secondly, we have only appellant's statements in its briefs and in its moving papers below and no competent evidence in the record before us to support appellant's assertion that Mr. Allen's agent stated "that he would not perform unless [appellant] doubled the relocation expense already agreed to by the other actors." This characterization of the agent's reaction differs dramatically from that of the arbitrator's. In her opinion, the arbitrator described the agent's reaction to the relocation fee as follows: "She was unhappy with the amount and believed it to be below SAG minimums." Being "unhappy" and affirmatively refusing to perform cannot be said to be equivalents. Given this ambiguity in the record before us and the long-established rules on appeal, we will not reverse the judgment confirming the arbitration award, on the basis of this argument.

■ Finally, we address appellant's contention that the arbitration award is violative of public policy and, consequently, must be reversed. The public policies at issue, according to appellant, are those against drunken driving, against unauthorized use of property, against use of obscene and threatening language, and against making threats to commit arson. Appellant asserts that, assuming arguendo that it exercised its option to employ Mr. Allen, it terminated him for precisely this misconduct, which it argued below was a default by Mr. Allen.

Interpreting the definition of "default" in Series Employment Agreement, the arbitrator specifically found that while Mr. Allen's "conduct was objectionable in the extreme," it was not covered by the definition. The arbitrator heard all the testimony below; our record includes only selected portions of Ms. Conrad's testimony regarding the Allen brothers' trip to Tahoe and the related telephone call. This simply is an insufficient ground upon which to base a finding of a violation of public policy grievous enough to warrant reversal of the judgment. (*Stead Motors* v. *Automotive Machinists Lodge No. 1173, supra,* 886 F.2d at pp. 1209-1212.)

The superior court did not abuse its discretion when it confirmed the arbitration award.

III. *Attorney Fees.*

■ In pertinent part, Labor Code section 1128, subdivision (b), provides: "Where a party to a collective bargaining agreement appeals the decision of an arbitrator regarding disputes concerning the collective bargaining agreement, the court shall award attorney's fees to the prevailing appellee unless the appellant has raised substantial issues involving complex or significant questions of law."

Appellant's appeal has not raised "substantial issues involving complex or significant questions of law." Rather, it merely has questioned, albeit vehemently, whether the arbitrator's decision and award drew its essence from the pertinent agreements, and challenged the arbitrator's interpretations. Pursuant to this statute, we award attorney fees to SAG.

## DISPOSITION

The judgment is affirmed.

The cause is remanded to the superior court for determination of the appropriate amount of attorney fees to be awarded to SAG.

George, Acting P. J., and Epstein, J., concurred.