**EMPLOYERS INSURANCE OF WAUSAU, a Mutual Company, Plaintiff–Counter–Defendant, Appellee,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, Defendant–Counter–Claimant, Appellant.**

No. 89–16307.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 3, 1991.

Decided May 20, 1991.

Michael F. Perlis, Stroock, Stroock & Lavan, Los Angeles, Cal., for defendant-counter-claimant, appellant.

Timothy Regan, Zelle & Larson, Minneapolis, Minn., for plaintiff-counter-defendant, appellee.

Before TANG, FARRIS and D.W. NELSON, Circuit Judges.

TANG, Circuit Judge:

The district court affirmed a tripartite arbitration panel's decision that Employers Insurance of Wausau ("Wausau") could offset claims made by National Union Fire Insurance Company of Pittsburgh ("National") under various reinsurance agreements against money Wausau asserted National owed it under a separate reinsurance contract. The court denied National's motion for vacatur, in which National claimed that the panel's decision contradicted the contract's language, was ambiguous, and

was the product of unfair proceedings. National appeals.

## BACKGROUND

This case arises from a tangled web of reinsurance agreements between Wausau and National. National entered into a contract to reinsure Wausau on an officers and directors liability policy issued to BankAmerica. The parties submitted to arbitration their dispute over Wausau's efforts to collect under the reinsurance policy.

Prior to the commencement of the BankAmerica arbitration, the district court issued an injunction in which, among other things, it forbade National from interfering with Wausau's efforts to settle the BankAmerica litigation. The district court later declined Wausau's request to order National to make payments under the reinsurance agreement in advance of the arbitration decision. In January 1988, the district court clarified the scope of its injunction by finding that delaying National's payment until the arbitration concluded would not cause Wausau irreparable harm. The court concluded that no basis existed for including an order for advance payments in the injunction.

Some time after Wausau requested compensation under the BankAmerica claim, the two companies reversed roles. National submitted a request for payment by Wausau under certain contracts in which Wausau had agreed to reinsure National. Rather than pay, Wausau elected to offset the money National sought against the payments Wausau claimed National already owed it under the BankAmerica reinsurance contract.

In August 1988, National demanded arbitration of Wausau's right to offset. In November, the district court ordered, over Wausau's objection, arbitration of the offset issue. As formally articulated by the arbitration panel, the precise issued presented was: "Is the BAC [BankAmerica] Claim, in its present status, 'due' for purpose of offset under the instant contracts?" Resolution of this issue required the interpretation of two distinct contractual provisions defining the parties' rights.

The gist of the dispute over offset under one set of contracts, known as the "reinsurance treaties," focused on the meaning of the word "aforesaid" in the last sentence of the offset clause. The relevant portion of the reinsurance treaties provided:

> Each party hereto shall have, and may exercise at any time and from time to time, the right to offset any balance or balances, whether on account of premiums or on account of losses or otherwise, due from such party to the other (or, if more than one, any other) party hereto under this Agreement or under any other reinsurance agreement heretofore or hereafter entered into by and between them, and may offset the same against any balance or balances due or to become due to the former from the latter under the same or any other reinsurance agreement between them; and the party asserting the right of offset shall have and may exercise such right whether the balance or balances due or to become due to such party from the other are on account of premiums or on account of losses or otherwise and regardless of the capacity, whether as assuming insurer or as ceding insurer, in which each party acted under the agreement or if more than one, the different agreements involved, provided, however, that, in the event of the insolvency of a party hereto, offsets shall only be allowed in accordance with the provisions of Section 538 of the Insurance Law of the State of New York. *The aforesaid shall only be invoked in instances where the conditions necessary to effect Article IV, Section (c) and (d) contained in this contract have been met.*

(Emphasis added).

Sections (c) and (d) of Article IV provide:

> (c) The Reassured may terminate this Agreement forthwith in the event that: A reinsurer hereon should at any time become insolvent, or suffer any impairment of capital, or file a petition in bankruptcy, or go into liquidation or rehabilitation, or have a receiver appointed, or be acquired or controlled by

any other insurance company or organization, or

(d) There is a severance or obstruction of free and unfettered communication and/or normal commercial and/or financial intercourse between (a) the United States of America, (b) the country in which the Reinsurer is incorporated or has its principal office or (c) as a result of war, currency regulation, or any circumstances arising out of political, financial or economic emergency.

Wausau argued that "aforesaid" referred only to the immediately preceding circumstances under which New York law would be invoked. Article IV's conditions, then, only limited offset rights when one party is insolvent. National, on the other hand, contended that "aforesaid" referenced the entire clause, drastically limiting the availability of offsets to either party.

The other contracts at issue, denominated the "reinsurance certificates," contained a much less obtuse offset clause: The battle here centered on the meaning of the word "due." The reinsurance certificates' offset clause reads:

The Reinsurer may offset any balance(s), whether on account of premiums, commissions, claims, losses, adjustment expense, salvage or any other *amount(s) due from one party to the other* under this certificate of reinsurance or under any other agreement heretofore or hereafter entered into between the Company and the Reinsurer, whether acting as assuming reinsurer or as ceding company.

(Emphasis added).

In Wausau's opinion, a claim was "due" at the time the reinsured requested payment. National argued that the BankAmerica claim would not be "due" until formally adjudged so by the arbitration panel and/or the district court.

Both the reinsurance treaties and the reinsurance certificates provide for the arbitration of disputes arising under the contracts. The parties elected to use a tripartite panel. Under this scheme, Wausau and National each chose one member of the panel. These two members then select a third neutral umpire. The arbitration panel establishes its own rules and procedures.

On February 15, 1989, the first of two hearings on the panel members' qualifications was held. During the hearing, National learned that the arbitrator Wausau selected, Mr. Richard Gilmore, had previously consulted with members of the law firm representing Wausau (Zelle & Larson) on the BankAmerica matter and that these consultations touched on the propriety of offsets. Under questioning by National's counsel, Mr. Gilmore explained that Zelle & Larson sought his "view of their [Wausau's] probability of getting paid for that [reinsurance claim]." Mr. Gilmore stated that he spent only a "couple" of hours on the project and did not prepare a written report of his recommendations. While he had looked at the BankAmerica claim, Mr. Gilmore testified that he had not formed a personal opinion on the matter.

Wausau provided the other panel members and National with copies of all the documents Zelle & Larson supplied Mr. Gilmore for purposes of his consultation.

In light of National's objection to Mr. Gilmore's selection as an arbitrator, the panel consulted outside counsel. The attorney advised it that the "panel was properly qualified and was unbiased." The panel unanimously affirmed its belief in each member's impartiality:

We will repeat, reaffirm, and re-repeat once more that we continue to believe and it's the unanimous opinion of this panel that each of the members has the required character, competency, independence, and integrity to serve on the panel, and, clearly, we are properly qualified, as well. We are convinced that each member will act objectively and in an unbiased fashion with respect to the merits of this procedure.

Under its authority to promulgate rules of procedure, the panel unanimously decided to permit *ex parte* communications between the parties and the arbitrator each selected. The panel did not allow *ex parte* contacts with the neutral umpire. All *ex parte* contacts terminated at the end of the

hearing, however. None was allowed during deliberations.[1]

At the conclusion of the hearing, the panel affirmed by a vote of two to one (National's appointed arbitrator dissenting) that Wausau could offset National's claims for reinsurance against the money Wausau already claimed to be due under the BankAmerica agreement. The panel proceeded to hold unanimously that National could also offset against Wausau's offsets any amounts that it owed or might owe in the future. Specifically, the panel held:

1. Wausau may offset against the full amount of the Bank of America Corporation (BAC) claim, as currently or ultimately determined, other amounts which it now owes or may owe in the future to National Union, whether such other amounts be in dispute or not.

2. National Union may offset against amounts which Wausau has offset other amounts which it now owes or may owe in the future to Wausau, whether such amounts be in dispute or not, up to the full amount which Wausau has offset against the BAC claim.

3. Either party may take subsequent offsets, in accordance with paragraphs 1 or 2 hereof, provided that:

   a. at no time may the total amount of offsets taken by Wausau exceed the full amount of the BAC claim at that time plus any amounts which National Union has offset and

   b. at no time may the total amount of offsets taken by National Union exceed the total amount of offsets which Wausau has taken.

4. Any such offset amounts may be offset by either party whether such amounts arise from premiums, claims, claims expenses or commissions.

Less than a week after the panel's decision, Wausau filed a motion in district court to confirm the award. National answered a week later with a motion to vacate the award, arguing that the panel's decision is erroneous, ambiguous, and the product of misconduct and bias. The court heard oral argument on the motions on August 23, 1989, and issued a judgment confirming the award and denying vacatur on August 31, 1989.

With respect to the merits of the panel's decision, the district court found that it was neither an unreasonable interpretation of the contracts nor ambiguous. The court also noted that, at the arbitration hearing, the question of contract interpretation had reduced to a battle of experts debating the propriety of offsets. The decision of which expert to believe, the court concluded, rested within the sound discretion of the panel. The district court proved equally unreceptive to the allegations of bias levelled against Mr. Gilmore.

National filed a timely notice of appeal to this court.

## STANDARD OF REVIEW

We review *de novo* the district court's decision confirming the arbitration award and denying vacatur. *See Pack Concrete, Inc. v. Cunningham*, 866 F.2d 283, 284 (9th Cir.1989); *Sunshine Mining Co. v. United Steelworkers of America*, 823 F.2d 1289, 1293 (9th Cir.1987); *New Meiji Market v. United Food & Commercial Workers Local Union # 905*, 789 F.2d 1334, 1335 (9th Cir.1986). Factual findings underlying the court's decision will be reversed only if clearly erroneous. *Toyota of Berkeley v. Automotive Salesmen's Union*, 834 F.2d 751, 756 (9th Cir.1987), *cert. denied*, 486 U.S. 1043, 108 S.Ct. 2036, 100 L.Ed.2d 620 (1988), *modified*, 856 F.2d 1572 (9th Cir.1988). In particular, we will review factual findings concerning bias or misconduct on the part of panel members for clear error. *Id.*

We emphasize at the outset the extremely narrow scope of our review of the arbitration panel's decision. *Sheet Metal*

---

1. The panel stated:
   In that regard, it's the unanimous finding of the panel that the party-appointed arbitrators can act, quote, "ex parte," unquote in discussions with the counsel who appointed specific arbitrators in an arbitrator/advocate fashion throughout these proceedings. That will cease when the hearing is concluded. From that point on there will be no contact between the party-appointed arbitrators and counsel.

*Workers Int'l Ass'n v. Arizona Mechanical & Stainless, Inc.*, 863 F.2d 647, 653 (9th Cir.1988); *see also Stead Motors of Walnut Creek v. Automotive Machinists Lodge*, 886 F.2d 1200, 1205–07 (9th Cir. 1989) (en banc), *cert. denied*, — U.S. —, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990). The panel's interpretation of a contract must be sustained if it is "plausible." *Arizona Mechanical*, 863 F.2d at 653 ("If, on its face, the award represents a plausible interpretation of the contract, judicial inquiry ceases and the award must be enforced."); *Pacific Motor Trucking Co. v. Automotive Machinists Union*, 702 F.2d 176, 177 (9th Cir.1983) (per curiam) ("We enforce an arbitration award if it represents a 'plausible interpretation of the contract in the context of the parties' conduct.' ") (quoting *Holly Sugar Corp. v. Distillery, Rectifying, Wine & Allied Workers Int'l Union*, 412 F.2d 899, 903 (9th Cir.1969)). We may not predicate reversal on the arbitration panel's erroneous findings of fact or conclusions of law. *Stead Motors*, 886 F.2d at 1206; *Broadway Cab Coop. v. Teamsters & Chauffeurs Local Union*, 710 F.2d 1379, 1382 (9th Cir. 1983); *Coast Trading Co. v. Pacific Molasses Co.* 681 F.2d 1195, 1198 (9th Cir.1982) ("The rule is, though the 'arbitrators' view of the law might be open to serious question, ... [an award] which is one within the terms of the submission, will not be set aside by a court for error either in law or fact.' ") (quoting *San Martine Compania De Navegacion S.A. v. Saguenay Terminals Ltd.*, 293 F.2d 796, 800 (9th Cir.1961)).

## DISCUSSION

### I. *Contract Interpretation*

#### A. *The Contract Language*

■ National argues that we should vacate the panel's decision because it contradicts the plain language of the contracts. In so doing, National asks us to review the merits of the arbitrators' decision. We decline the invitation.

The Federal Arbitration Act strictly demarcates the grounds upon which a federal court may vacate an arbitration award:

In either of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

(a) Where the award was procured by corruption, fraud, or undue means.

(b) Where there was evident partiality or corruption in the arbitrators, or either of them.

(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10.

We thus have no authority to vacate an award solely because of an alleged error in contract interpretation. *San Martine*, 293 F.2d at 800. *See also Bernhardt v. Polygraphic Co. of America, Inc.*, 350 U.S. 198, 203 n. 4, 76 S.Ct. 273, 276 n. 4, 100 L.Ed. 199 (1956) ("Whether the arbitrators misconstrued a contract is not open to judicial review."); *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987) ("[T]he parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract."); *Arizona Mechanical*, 863 F.2d at 653 (" '[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.' " (quoting *Misco*, 484 U.S. at 38, 108 S.Ct. at 371)).

■ Our task, consequently, is quite simple. We need only determine whether the arbitrators' interpretation was "plausible." *Arizona Mechanical*, 863 F.2d at 653; *Pacific Motor*, 702 F.2d at 177. As noted

earlier, the propriety of offsets under these contracts turned upon an interpretation of the word "aforesaid" in the reinsurance treaties and of the word "due" in the reinsurance certificates. By permitting Wausau to take offsets, the arbitrators construed "aforesaid" to refer to the procedures governing the insolvency of a party.

National observes that this makes the offset clause read rather awkwardly and with some repetition. However, National's interpretation is not without problems either. Under its theory, the last sentence of the clause would inexplicably and drastically narrow the right of offset to rare and unusual circumstances. The end of the clause would thus be virtually irreconcilable with the capacious language introducing the parties' rights to offset.[2] Thus, while Wausau's interpretation is somewhat inelegant and redundant,[3] National's theory creates an internal contradiction in the clause's language. Informed by expert testimony, the panel exercised its best judgment and chose between two rather tortured readings of "aforesaid." Because the adoption of Wausau's theory over National's was not unreasonable and does not result in an implausible interpretation of the clause, vacatur of the arbitrators' decision would be inappropriate.

■ We likewise hold that, with respect to the reinsurance certificates, the arbitrators' conclusion that "due" meant when a claim was submitted, rather than when it was finally adjudicated, is not implausible. With little guidance from the contracts' language, the panel looked to expert testimony to determine the viability of taking offsets prior to their final determination. The experts' testimony conflicted, forcing the panel to choose one over the other. National offers no argument to discredit Wausau's expert, nor does it suggest that his testimony was so incredible or irrational as to warrant overruling the arbitrators'

credibility determination. Vacatur on the ground of implausibility requires a greater showing than that the arbitrators reasonably chose between competing theories and conflicting witnesses.

National's argument that common law precludes offsets represents another effort to coax us into a review of the merits. Mistakes in law—statutory, constitutional, or common—do not merit vacatur. Moreover, the arbitrators' task was to discern the parties' contractual intent, not to apply the common law. Absent illegality or public policy concerns, parties are free to obligate themselves contractually to undertake uncommon or innovative business practices.[4] Consequently, the panel's decision was not implausible.

In short, because both the reinsurance treaties and the reinsurance certificates could plausibly be read to permit offset, "judicial inquiry ceases and the award must be enforced." *Arizona Mechanical,* 863 F.2d at 653.

B. *Conflict with the District Court's Order*

■ National argues, as an alternative ground for vacatur, that the panel's interpretation conflicts with the district court's January 1988 order clarifying the scope of its injunction. National reads that order as a determination that National did not owe Wausau any money pending the outcome of the litigation. In National's opinion, the district court held that no money was currently "due" to Wausau. The arbitrators' ruling that a claim is "due" within the meaning of the reinsurance certificates, National concludes, contravenes the district court's order.

This argument reads too much into the January order. In that decision, the district court held only that, because Wausau had not shown irreparable harm, it was not

---

**2.** The offset clause begins by stating that each party "may exercise *at any time and from time to time,* the right to offset." (Emphasis added.)

**3.** The repetitiveness is not nearly as stark as National portrays it. The provision referencing New York law applies to both the reinsurer and the reinsured. Sections (c) and (d) of Article

IV, by contrast, speak to conditions impacting the reinsurer only.

**4.** National does not argue that the contract, as interpreted, violates the law or offends public policy.

entitled to a preliminary injunction ordering National to begin paying the claim immediately. Nothing in the order purported to interpret the word "due" in the reinsurance certificates. Nor did it decide if payments were "due" as a matter of general law. In short, the court did not decide that money was not due. It simply held that, even if money were due, the court lacked the equitable authority to order payment at that time.[5] Consequently, we will not vacate the arbitrators' decision on the basis of a non-existent conflict with the district court's January order.

## II. *Ambiguity*

■ National argues that we should vacate the arbitrators' decision for ambiguity. Specifically, National objects to the panel's failure to decide how a claim is to be "currently or ultimately determined" for purposes of calculating offsets. We do not find the decision ambiguous.

National premises much of its ambiguity argument on the notion that the district court's January order "determined" that no money was currently due Wausau. As noted earlier, this contention misinterprets the court's ruling.

Moreover, the answer to National's question may fairly be discerned from the text of the decision, when considered in light of the issue presented. Wausau had argued all along that money was "due" when it submitted its reinsurance claim to National, and not years later when a court ultimately adjudicated the validity of the claim. The panel's opinion reveals that it agreed with Wausau. Consequently, the phrase "currently or ultimately determined" refers to the amount the reinsured claims (unless and until a court says otherwise).

The arbitrators' failure to define expressly every aspect of their holding does not merit vacatur. "Even if a slight ambiguity does exist, the Supreme Court has indicated that minor ambiguities are not a basis for denying enforcement of an arbitration award." *New Meiji*, 789 F.2d at 1336; *see also Stead Motors*, 886 F.2d at 1208 ("General references to 'ambiguity' [are] not to serve as excuses for judicial rehearing of a grievance."); *accord United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 598, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960).

In sum, to merit vacatur, the ambiguity must be substantial and adversely affect a party's ability to understand or comply with the award. Because National has made no such showing, we will not vacate the arbitrators' decision for ambiguity.[6]

## III. *Arbitral Bias or Misconduct*

National challenges not only the outcome of the arbitration, but also the integrity of the process itself. The Federal Arbitration Act permits vacatur if "there was evident partiality or corruption in the arbitrators" or if "the arbitrators were guilty of misconduct" in the course of the proceedings. 9 U.S.C. § 10(b) and (c). National argues that (i) Mr. Gilmore's apparent bias, (ii) the panel's exclusion of certain evidence, and (iii) the decision to permit *ex parte* communications so tainted the proceedings as to warrant vacatur. We reject each of these arguments.

### A. *Bias*

■ National argues that Mr. Gilmore's prior contact with counsel for Wausau on matters pertaining to the BankAmerica and offset issues constitutes "evident

---

**5.** Even were National's reading of the order correct, a decision that National did not affirmatively have to transmit money to Wausau does not necessarily conflict with a holding that Wausau could, on its books, offset against National's requests for payments money that National already owed Wausau. *Cf. W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers of America*, 461 U.S. 757, 769, 103 S.Ct. 2177, 2185, 76 L.Ed.2d 298 (1983) (vacatur not appropriate because "[e]nforcement of the [arbitration]

award will not create intolerable incentives to disobey court orders").

**6.** Even were we to conclude that the arbitrators' decision was fatally ambiguous, the appropriate relief would be an order recommitting the case to the arbitrators for clarification, not vacatur. *See Sunshine Mining*, 823 F.2d at 1295; *see also Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.*, 868 F.2d 52, 58 (3d Cir.1989).

partiality" within the meaning of 9 U.S.C. § 10(b). National bears the burden of demonstrating with specific facts "a reasonable impression of partiality." *Sheet Metal Workers Int'l Ass'n v. Kinney Air Conditioning Co.*, 756 F.2d 742, 745–46 (9th Cir. 1985); *see also Toyota*, 834 F.2d at 755. Unlike the standard for judges, parties must demonstrate more than a mere appearance of bias to disqualify an arbitrator. *Toyota*, 834 F.2d at 755; *Kinney*, 756 F.2d at 746.[7] To hold arbitrators to the same rigorous standard of impartiality as judges would, in many cases, erase the salutary aspects of arbitration as opposed to litigation. As Justice White observed, "It is often because they [arbitrators] are men [and women] of affairs, not apart from but of the marketplace, that they are effective in their adjudicatory function." *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 150, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968) (White, J., concurring). Consequently, "arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance." *Id.*

While the connection between Mr. Gilmore and Wausau was not insubstantial, we nonetheless hold that the district court's finding that Mr. Gilmore was impartial was not clearly erroneous. First, Mr. Gilmore's consultation efforts appear to have been brief, entailing only a couple of hours' work.

Second, copies of all of the documents submitted to Mr. Gilmore were provided to the other panel members and National. Mr. Gilmore thus had no informational advantage over the other arbitrators.

Third, the panel unanimously affirmed its belief in each member's impartiality:

> We will repeat, reaffirm, and re-repeat once more that we continue to believe and it's the unanimous opinion of this panel that each of the members has the required character, competency, independence, and integrity to serve on the panel, and, clearly, we are properly qualified, as well. We are convinced that each member will act objectively and in an unbiased fashion with respect to the merits of this procedure.

We find it telling that the panel itself, including National's own representative, unanimously believed Mr. Gilmore to be impartial.

Fourth, and perhaps most importantly, Mr. Gilmore's testimony reveals that he formulated no fixed opinions or definite conclusions on the BankAmerica and offset questions.[8] With respect to the offset issue in particular, Mr. Gilmore stated that his brief contact with Zelle & Larson had not caused him to develop a definite opinion on the issue. He simply surveyed Wausau's options at the time.[9]

---

**7.** *Cf.* 28 U.S.C. § 455(a); American Bar Association Code of Judicial Conduct, Canon 3(C).

**8.** MR. McGAHREN [counsel for National]: Did you reach conclusions with respect to the question that was put to you? Did you come to an opinion?

MR. GILMORE: I don't know if I did or not, to tell you the truth. I certainly expressed a bunch of views as to the various aspects of the whole question. I think they might have come to a conclusion as a result of what I had to say. I think to put the question currently I don't think I have a conclusion.

**9.** MR. GILMORE: Have I discussed with them my views of the propriety of offset in this situation? Is that what you're asking?

MR. McGAHREN: Yeah.

MR. GILMORE: Yes.

MR. McGAHREN: Was that before you were approached to be an arbitrator in this matter?

MR. GILMORE: Yes.

MR. McGAHREN: Did you give them any view with respect to that question, the appropriateness of offsets?

MR. GILMORE: I gave them a whole bunch of views. All sides and angles and facets. I didn't have a conclusion if that's what you're asking. But I gave them a spread of views with respect to various market possibilities.

\* \* \* \* \* \*

MR. GILMORE: I don't mind answering the question. I expressed views to Zelle & Larson that went from yes, no, maybe, and probably every radiation in between with respect to X and Y and Z as receiving and assuming companies, and I mean that literally, whoever they might be, not necessarily Wausau or anybody else; and as I recall with respect to how the different markets view that, how a direct broker might look at it, how a London market might look at it, how Japan might look at it, how Germany might look at it, so I think the fairest answer I could give you is you pick a view and I

Mr. Gilmore, in other words, simply surveyed the relevant issues and concerns for Zelle & Larson. Nothing in the record indicates that Mr. Gilmore came to the arbitration hearings with a closed mind or a predilection to rule for Wausau. Mr. Gilmore thus approached the litigation, not as a predisposed partisan, but rather as an expert knowledgeable in the area. One of the reasons parties prefer arbitration to litigation is the opportunity to have a case decided by persons experienced in the particular commercial field. "Familiarity with a discipline," while in some aspects a virtue of arbitration, "often comes at the expense of complete impartiality." *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 83 (2d Cir.1984).

Because the consultation relationship was brief, and because Mr. Gilmore had neither preconceived convictions on the merits of the case nor a proven informational advantage, we conclude that the district court's determination that Mr. Gilmore was not tainted by "evident partiality" was not clearly erroneous.

## B. *Exclusion of Evidence*

■ National also challenges the arbitration award on the ground that the panel "refused to accept certain critical evidence submitted by National." The only specific ruling that National refers to, however, is an alleged failure to admit testimony concerning the merits of the BankAmerica dispute. National argues that the panel erred in excluding this evidence because it had already admitted comparable material submitted by Wausau. We reject this argument.

First, the district court expressly instructed the arbitrators not to address the merits of the BankAmerica dispute. Thus National's rejected evidence—which it characterizes as "critical"—was irrelevant to the issue being arbitrated. That the panel previously admitted irrelevant evidence submitted by Wausau does not make its decision to foreclose the introduction of

more irrelevant evidence reversible error. *Hoteles Condado Beach v. Union de Tronquistas de Puerto Rico, Local 901*, 763 F.2d 34, 40 (1st Cir.1985) ("An arbitration award must not be set aside for the arbitrator's refusal to hear evidence that is ... irrelevant." (citations omitted)).

Second, National has neither argued nor demonstrated that this evidentiary ruling influenced the outcome of the arbitration. Yet a showing of prejudice is a prerequisite to relief based on an arbitration panel's evidentiary rulings. *See, e.g., Burchell v. Marsh*, 58 U.S. (17 How.) 344, 350, 15 L.Ed. 96 (1854) (to warrant reversal because of an arbitrator's mistake in the conduct of the hearing, party must show that "if it had not happened, [the arbitrator] should have made a different award"); *Mutual Fire*, 868 F.2d at 57; *Hoteles Condado*, 763 F.2d at 40; *accord Misco*, 484 U.S. at 40, 108 S.Ct. at 371 (vacatur appropriate only if refusal to hear evidence amounted to affirmative misconduct). Consequently, even were the excluded evidence relevant, National still is not entitled to vacatur because of its lack of evidence of prejudicial impact.

## C. *Ex Parte Communications*

■ National lastly cites the panel's decision to permit *ex parte* contacts between the parties and their designated arbitrators as evidence of arbitral misconduct meriting vacatur. We reject this argument as well.

First, because National itself engaged in some of the very *ex parte* contacts to which it objects, the company is ill-positioned to make this challenge. If National truly considered such conduct beyond the pale, it should have refrained from engaging in its own *ex parte* contacts and simply preserved its objection for appeal.

Second, National again has failed to demonstrate that any prejudice resulted from the *ex parte* contacts. *Mutual Fire*, 868 F.2d at 57 (vacatur inappropriate where party failed to show prejudice from *ex parte* contacts); *cf. Totem Marine Tug & Barge, Inc. v. North American Towing,*

possibly gave it to them because we were discussing what could possibly happen here so we

went over everything. I don't think I can give you any better answer than that.

*Inc.,* 607 F.2d 649, 653 (5th Cir.1979) (award vacated in part because the "ex parte receipt of evidence bearing on this matter constituted ... prejudic[e] to Totem's rights").

The reinsurance contracts empowered the arbitrators to craft their own rules of procedure. The decision to permit *ex parte* contacts was open and above board. There was nothing sinister or inherently one-sided about the contacts. Absent evidence of prejudice, therefore, we decline to vacate the award on this ground.

In short, perhaps National did not enjoy a perfect hearing; but it did receive a fair hearing. It had notice, it had the opportunity to be heard and to present relevant and material evidence, and the decisionmakers were not infected with bias. National was entitled to no more. *Sunshine Mining,* 823 F.2d at 1295. *See also Burchell,* 58 U.S. (17 How.) at 352 ("If they [the arbitrators] have given their honest, incorrupt judgment on the subject-matters submitted to them, after a full and fair hearing of the parties, they are bound by it; and a court ... [has] no right to annul their award because it thinks it could have made a better.").

## CONCLUSION

The district court did not err in affirming the arbitrators' decision. Their interpretation of the contract was plausible and unambiguous. Furthermore, the district court did not clearly err in finding that Mr. Gilmore was not biased. The evidentiary and procedural rulings made by the panel did not prejudice National in any demonstrated way.

AFFIRMED.